Filed 4/23/14  Certified for publication 5/14/14 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (El Dorado)

**----**

| | |
|---|---|
| In re I.R. et al., Persons Coming Under the Juvenile Court Law. | C075240 |
| EL DORADO COUNTY DEPARTMENT OF HUMAN SERVICES, | (Super. Ct. Nos. SDP20110033, SDP20110034) |
| Plaintiff and Respondent, | |
| v. | |
| I.R. et al., | |
| Appellants. | |

The minors appeal from orders of the juvenile court placing them in long-term foster care after finding both the parental beneficial relationship and the sibling exceptions to the preference for adoption applied.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

We granted appellants' application to stay proceedings in the juvenile court until further order of this court.

Appellants contend, and respondent El Dorado County Department of Human Services (Department) agrees, that the juvenile court's findings are not supported by substantial evidence and that the juvenile court abused its discretion in ordering a permanent plan of long-term foster care for the minors. On review, it appears the court relied on facts and circumstances that were not relevant to the issues before it. This resulted in findings and orders not supported by relevant evidence and an abuse of discretion in ordering long-term foster care. Accordingly, we shall reverse and, based on the statutory limitations and the relevant evidence in the record, direct the juvenile court to terminate parental rights. The previously granted stay is vacated.

**FACTUAL AND PROCEDURAL BACKGROUND**

In September 2011, the Department filed non-detaining petitions on six-month-old I.R. and 19-month-old K.R. The petitions alleged the parents failed to participate in voluntary family maintenance offered in February 2011. Both parents suffered from serious mental health issues but neither was in treatment and both were periodically unable to care for the minors. Further, father had a history of substance abuse and mother's medical and physical issues limited her ability to care for the minors. The Department recommended court-ordered family maintenance services. The family also included a six-year-old half sibling who is a special needs child with cognitive delays. In October 2011, the court sustained the non-detaining petitions and adopted the Department's recommended disposition of family maintenance.

Six months later, in April 2012, the Department filed section 387 petitions to remove one-year-old I.R. and two-year-old K.R. from parental custody. The parents had left one or both of the minors in the bathtub unsupervised several times, and in one instance, the older half sibling had tried to drown I.R. By this time, the parents had been

2

offered services for more than one year but showed no change in parenting behavior and blamed the half sibling for the emergency removal because he had disclosed the lack of parental supervision that led to the bathtub incident and other dangerous situations. The court ordered the minors detained.

The combined jurisdiction/disposition report stated that K.R. was moved from the foster placement she shared with I.R. due to her aggressive behavior toward him. The social worker identified the parents' ongoing problems of untreated mental health issues and their limited parenting skills when dealing with toddlers despite the voluntary and court-ordered services. The report recommended further reunification services. An addendum report indicated the parents were beginning to make progress since the minors' removal and recommended extended visits to transition the minors home after an assessment of parental compliance with services. The court adopted this recommended disposition in May 2012.

The parents failed to reunify and, in December 2012, the court terminated services and set a section 366.26 hearing. The court ordered supervised visitation to occur two times a month for a total of two hours per month for mother and a minimum of once a month for two hours and a maximum of two times a month for four hours for father. The social worker was given discretion to increase mother's visitation.

The April 2013 report for the section 366.26 hearing stated the minors were healthy and developmentally on target. The parents had maintained regular contact until the beginning of February when mother could not travel due to her pregnancy. Thereafter, the parents had a single visit in March. The minors had been placed in the same home since November 2012 and enjoyed a close relationship with each other and the foster parents. The Department recommended termination of parental rights with adoption as the permanent plan because the minors needed permanence and stability.

3

The new baby was born in April 2013 and was placed in the same foster home as K.R. and I.R. The parents' visits with the baby were separate from visits with the two older minors.

Mother and father each filed a section 388 petition for modification in April 2013 seeking to reinstate services. Mother alleged circumstances were changed because she had continued in therapy, was making progress and the home was appropriate. Father alleged circumstances were changed because they were receiving services for the new baby and continued services for the half sibling, he was making progress in counseling, visits were going well, he was testing clean and was active in couples counseling. A therapist's letter attached to mother's petition indicated the parents had improved their ability to interact and accept accountability for their emotions and behaviors. Father cited testimony from the new infant's detention hearing to support the claims of substantial progress and change of attitude.

The Department filed an informational report in response to parents' petitions for modification. The report stated the social worker attempted to observe the parents' visit with the infant minor but the apartment was dark and no one was present. Father insisted they had been home and had not violated visit rules. On April 26, 2013, the social worker received a drug test for the father that was positive for morphine on a sample taken April 22. Father said it was impossible that he had a positive test result but explained it might be due to eating five poppy seed bagels on April 25, 2013. When confronted with the date the sample was taken, father said he ate the poppy seeds on the date of the test. The toxicologist confirmed that a morphine test could be affected by eating five poppy seed muffins. The social worker commented that the parents were poor historians and it was hard to assess their progress.

An addendum report in September 2013 stated both minors adored their baby sister. K.R. was excited to tell the adoptions worker she had a new baby sister. I.R.

4

played with the baby and sometimes kissed her.  The report said the parents had two visits a month for two hours each.  The foster agency records showed no visits at the agency in January 2013 because the parents did not call to schedule any.  Visits at the agency were to begin in February 2013 but did not occur due to mother's pregnancy.  There was a visit at court in May 2013; the parents did not request a visit in June.  The parents arranged a visit for July 1, 2013, but had transportation problems and cancelled the visit.  The parents visited at the foster agency office on July 8, 2013.  There was one visit in mid-August but, while the minors were transported for a second visit in late August, the parents failed to attend.  The visit supervisor reported that the minors appeared happy to see the parents although K.R. had some defiance/aggression issues in visits.  Overall, the visits were appropriate and transitions were unremarkable unless mother was emotional.  The foster mother described the minors' behavior after visits as "like any other day."  The Department concluded the minors were highly adoptable and recommended termination of parental rights and a permanent plan of adoption to provide the stability and security they needed.

The combined sections 366.26 and 388 hearing commenced in October 2013. Mother testified the older half sibling was placed in a foster home and was unlikely to return home.  Mother also testified about her continued progress in services provided to her for reunification with the baby who was born in April 2013.  Mother said the minors were happy to see her and father at visits.  She described a typical visit—which included watching movies, cuddling, eating snacks, playing and roughhousing.  She believed the minors were bonded to the parents based on their behavior in visits.  Mother testified the minors talked about the baby at visits and played with a doll as if it were the baby. Mother believed the minors share a sibling relationship with the baby.  Mother provided confused and somewhat inconsistent testimony about the frequency of the parents' visits after termination of services.  She stated there was one visit in December 2012 but in

5

2013 they had no visits in January, February, March or April, one near the end of May, two in June, July, August and September and one in October. Mother acknowledged she missed one visit in September. She also recalled that the minors may have been brought to their home in December 2012 and January 2013 but did not see them from the March visit until May.

The Environmental Alternatives foster agency (EA) social worker testified the parents were entitled to two visits a month. EA records showed the parents attended one visit from January to March 2013, none in April, one of two in May, none in June, one of two in July, none in August, two in September and one in October. The records also showed three visits between March and August when the minors were transported for a visit but the parents did not come. On cross-examination, the EA social worker agreed it was possible there was one visit in March 2013. Pictures on the mother's phone showed a visit at their home that month so EA would not have a record of it. The EA social worker had supervised more than five visits after services were terminated. When supervising at the agency office, the EA social worker would sit outside the visit room where she could hear what was going on and periodically visually check the visit. She never heard either minor talk about the baby or ask why the baby was not included in visits. She testified that, if the family is not eating or watching a movie, visits became somewhat chaotic with little or no attempt at redirection by the parents. The EA social worker stated that the parents themselves would engage in the boisterous behavior and support it. She said that previous visits in the parents' home were marked by the minors' tantrums and parents' difficulties in getting them to engage in any activity. There was some improvement once all visits were at the EA office but the parents still were unable to redirect the minors into an activity when the minors' behavior escalated. However, the parents did attempt to engage the minors in activities and had some success. In her foster home visits, the EA social worker had not heard the minors ask about their parents. She

6

had observed I.R. go up to the baby sometimes and kiss her, but K.R. generally did not notice the baby was there. The minors were more interested in their own activities than playing with the baby. Based on the interactions in the home and lack of inquiry when the baby was not present, the EA social worker opined that removal of the baby would not detrimentally affect the minors.

The social worker assigned to the case during reunification testified there was one visit in January and one in February of 2013. While he had seen changes in the parents since services were terminated in the minors' case, he would not change the recommendation (to terminate parental rights) because the minors deserved permanency. He had no concerns that termination of parental rights would disrupt any significant sibling or parental bond.

The foster mother testified the minors had been in her home about a year. The minors call their sister "baby" or "baby sister"—they do not use her name. They often do not know when she is gone visiting the parents and do not react when she returns. The foster mother testified there was a time, when the baby was visiting the parents, K.R. noticed the foster mother had not gone upstairs at dinnertime to feed the baby and asked the foster mother if she was going to do so. On another occasion, I.R saw the foster mother in the room where she usually rocked the baby to sleep and whispered, "Shhh. Baby sleeping," but did not realize the baby was not there, but was again visiting the parents. The foster mother said she also rocked I.R. on occasion and he comes in the room when she's rocking the baby because he knows he can share the time. The foster mother stated that K.R. did not interact much with the baby or play with her, while I.R. engaged with the baby more. She did not believe it would be detrimental to the minors if the baby were moved to a different home. The foster mother testified the baby does not recognize her siblings and was happy when anyone got in her face and played with her.

The adoption worker testified she had observed the siblings' interaction in the foster home. She would not change her recommendation to terminate parental rights as to K.R. and I.R. based on those observations because, due to their age and development, severing the sibling relationship with the baby would not be detrimental to them. She acknowledged there was always some detriment in severing relationships but that the benefit of permanency was important to a child and had to be weighed. The adoption worker further testified that neither minor has a concept of the sibling bond as that term is used in court and, while K.R. might miss the baby if the baby were removed and be aware at some level that the baby has needs, neither minor would be traumatized by the baby's absence due to their ages and development.

In argument, the parties agreed the minors were likely to be adopted. The Department and minors' counsel argued the evidence did not support a finding of either the parental beneficial relationship or the sibling exceptions to the preference for adoption. The parents argued the evidence supported both exceptions.

The court issued a written decision finding the minors were likely to be adopted. The court further found that, for their age, the minors had developed a close, caring relationship with the baby, the bond was significant, and that severing the bond would be detrimental to the minors. In reaching this conclusion, the juvenile court twice emphasized that the parents' ongoing efforts to reunify with the baby were "most critical to the analysis" and were "a critical fact[or] in [the] consideration of the current situation." The court ordered a plan of long-term foster care "for the present time" and set a "renewed" section 366.26 hearing in six months. As noted, we granted the minors' application to stay proceedings until further notice of this court.

## DISCUSSION

## I. Long-term Foster Care "For the Present Time"

The minors contend the court exceeded its jurisdiction in selecting long-term foster care "for the present time" and setting a "renewed" section 366.26 hearing.

"A superior court convened as and exercising the special powers of a juvenile court is vested with jurisdiction to make only those limited determinations authorized by the legislative grant of those special powers." (*In re Lisa R.* (1975) 13 Cal.3d 636, 643; *In re Kaylee H.* (2012) 205 Cal.App.4th 92, 103; *In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622-1623.) Further, the scope of the juvenile court's discretion "always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297; *In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1536.)

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed or been refused. (§ 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304 (*Marilyn H*).) The alternatives available to the juvenile court at the section 366.26 hearing are limited to those set forth in the statute and, in order of preference, currently include: termination of parental rights and placement for adoption; tribal customary adoption; legal guardianship with a relative with whom the child is residing; make findings that termination of parental rights would not be detrimental to the child and there is a probability of adoption but the child is difficult to place, identify adoption as the goal, and continue the case to identify adoptive parents; appoint a nonrelative legal guardian; and, finally, order the child be placed in long-term foster care subject to periodic review. (§ 366.26, subd. (b)(1)-(6).)

9

Here, the court did not exercise its discretion to select among these alternatives. The court found the minors were likely to be adopted, but that adoption would be detrimental based upon the sibling exception, selected long-term foster care as an alternative, and set a selection and implementation hearing. This combination of alternatives was not available to the court as a possible selection under the governing statute. Having found the minors were likely to be adopted but that there was a compelling reason for determining that termination of parental rights would be detrimental because termination would substantially interfere with a sibling bond, the court was limited, in this case, to choosing between nonrelative legal guardianship and long-term foster care with periodic review. (§ 366.26, subd. (b)(5), (6).)

When the Department sought elucidation of the court's order, the court explained that it wanted to clarify what was happening in six months in the separate case of the infant sibling and wished to maintain the status quo in the minors' case. Thus, not only was the juvenile court's selection outside the legislative limits set forth in section 366.26, the decision was based on facts which were irrelevant to the case at issue and discounted both the legislative mandate and the minors' interests in securing a stable, permanent home, resulting in unnecessary delay.

"[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation of the length of time a child has to wait for a parent to become adequate." (*Marilyn H*., *supra*, 5 Cal.4th at pp. 308, 310.) The juvenile court is constrained by the Legislature to avoid unnecessary delays and " 'give substantial weight to a minor's need for prompt resolution' " of custody status, the need to provide the minor with a stable environment, and avoiding damage to the minor from prolonged temporary placements. (*Id.* at p. 308.) The court may not hold the permanence and stability for the minors hostage to the speculative outcome of a third child's case. The juvenile court's order was outside the statutory parameters and did not further the core

10

concerns of the statutory scheme. Accordingly, the juvenile court abused its discretion in creating a hybrid "permanent" plan to further goals not relevant in the action pending before it.

## II. Beneficial Parental Relationship and Sibling Exceptions to Termination

The minors argue that neither of the exceptions to termination discussed by the juvenile court is supported by substantial evidence, and finding either applied was an abuse of discretion.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible, and of solid value—to support the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) In making this determination we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, *supra*, 222 Cal.App.3d at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

"Once reunification services are ordered terminated, the focus shifts [from the parent's interests] to the needs of the child for permanency and stability." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate

11

parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) The exceptions relevant here are the beneficial parental relationship exception and the sibling exception. We consider the applicability of each.

### A. Beneficial Parental Relationship

The minors argue the court's finding—that termination of parental rights would be detrimental to them based on the beneficial parental relationship exception—is not supported by substantial evidence and was an abuse of discretion.

Termination of parental rights may be detrimental to a minor when: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Careful reading of the juvenile court's written order discloses that the juvenile court did not explicitly find the beneficial parental relationship had been established. The court correctly stated that the parents had to establish two prongs, i.e., regular visitation and benefit to the minors of continued contact with the parents that outweighed the benefits of adoption. However, the court found only that there had been visits, not that the parents maintained regular visitation. The undisputed evidence is that there was not regular visitation. The precise number of visits was in conflict, but both mother's testimony and that of the social workers were clear that there were significant lapses in visits. Regular visitation exists where the parents visit consistently and to the extent permitted by court orders. (*In re Brandon C*. (1999) 71 Cal.App.4th 1530, 1537.) That level of visitation did not occur here and its lack would fatally undermine any attempt to find the beneficial parental relationship exception.

Similarly, while the court found the minors and the parents had continued positive contact, it did not conclude that the second prong of benefit to the children from continued contact had been satisfied. At best, the court found the parental relationship was beneficial at the time of the order and conditioned any continuing benefit on the parents' cooperation with services and good behavior in the baby's case.

The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Teneka W*. (1995) 37 Cal.App.4th 721, 728-729; *In re Brian R*. (1991) 2 Cal.App.4th 904, 924.)

There was no evidence before the court that the positive contact outweighed the security and sense of belonging available in an adoptive home or that the minors would be greatly harmed if the positive relationship were terminated. Moreover, the court did not attempt to weigh the effect of the existing parental relationship against the minors' needs. Instead, the court delayed that weighing process to see if the parents continued their reformed behavior in the baby's case.

Because the evidence did not support either prong of the exception, the juvenile court correctly did not find the beneficial parental relationship had been established.

## B.  Sibling Relationship

A second circumstance under which termination of parental rights would be detrimental is when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.  Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.)

In its written opinion as well as in its statements at the final hearing, it was clear that the court viewed the factors of both the beneficial parental relationship and the sibling relationship through the lens of what it viewed as the "critical issue" of the parents' reunification efforts with the infant sibling.  This issue is completely irrelevant to not only the existence of a current sibling bond but also the minors' interests in the permanence of adoption.  Incorporation of this irrelevancy resulted in distorting the evidence of the sibling bond and was an abuse of discretion.  (Cf. *In re Baby Girl M.*, *supra*, 135 Cal.App.4th at pp. 1543-1544.)  When the irrelevance is pared away we are left with facts which do not support a finding of a sibling bond that is sufficiently significant to cause a level of detriment to the minors that would outweigh the benefit to the minors of legal permanence.

The undisputed facts are that the infant minor was six months old at the time of the hearing and had lived that period of time in foster care with K.R. and I.R., who were three and two years old respectively at the time of the hearing.[2] The infant minor visited the parents separately from K.R. and I.R. Mother did not see the older minors interact with the infant but believed they had a bond based on the fact that the older minors talked about the infant during visits. When the baby was gone for one of her visits, K.R. asked the foster mother at dinner time if she was going to feed the baby, not realizing that the baby was not there. Another time when the baby was gone, I.R. saw the foster mother in the room where the baby slept and said "Shhh. Baby sleeping." In the foster home, K.R. did not seek out the infant minor and her interaction with the baby was minimal. I.R. interacted with her more, going to her and kissing her and sharing time being rocked while the infant was being fed. While both minors knew the infant was their baby sister, the infant had no reciprocal awareness of the sibling relationship. All three social workers who testified opined that there was not a significant sibling relationship due to the ages and intellectual development of the minors. The adoption social worker testified K.R. would be sad if the baby left the foster home but would get over it and that I.R. would not be affected.

These facts do not establish either a significant period of time the minors lived together, the existence of shared experiences, that ongoing contact was in the minors' best interests or that there would be any significant effect on the minors' long-term emotional interests if parental rights were terminated. With the exception of I.R. and the

---

[2] The juvenile court's reliance on the fact that the Department "regarded the sibling relationship as significant" when placing the siblings together is misplaced. To further the intent of the Legislature, the Department was required to place the siblings together, regardless of when they were removed, unless placement together was contrary to the safety or well-being of any sibling. (§ 16002, subd. (a).) In this case, there was reason to place the older half sibling separately but no reason to separate the three younger children.

15

baby being rocked at the same time by the foster mother, none of their experiences, including contact with the parents, were shared in any meaningful sense. They lived in the same house but did not play with each other, visit with the parents together or even eat dinner together since the baby was fed separately. The minors' awareness of the existence of a baby in the household who was fed at certain times and slept at certain times simply does not rise to the level of understanding the baby's needs. At most, it shows a recognition that the baby's needs exist and are met within the schedule in the home. The minors' levels of maturity were not adequately advanced to be able to experience more than the simplest level of a sibling bond. When weighed against the benefit to the minors of a secure, stable, and permanent home, the facts do not establish that termination of parental rights would substantially interfere with a sibling relationship.

The sibling exception is intended to preserve sibling relationships of deeper and greater significance than the one here, where one of the siblings is too young to even understand that the minors are her siblings.

The record does not disclose compelling evidence that termination would be detrimental to the minors based on either of the proffered exceptions. Since the juvenile court found the minors were likely to be adopted and no facts support any option for a permanent plan other than adoption, reversal is required.

**DISPOSITION**

The orders of the juvenile court are reversed. The juvenile court is directed to vacate the section 366.26 hearing and its selection of long-term foster care as a

16

permanent plan and to enter orders terminating parental rights and placing the minors for adoption.  The stay previously imposed is vacated.


      BUTZ       , J.


We concur:


     HULL     , Acting P. J.


     ROBIE     , J.

Filed 5/14/14

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (El Dorado)

----

| | |
|---|---|
| In re I.R. et al., Persons Coming Under the Juvenile Court Law. | C075240 |
| EL DORADO COUNTY DEPARTMENT OF HUMAN SERVICES, | (Super. Ct. Nos. SDP20110033, SDP20110034) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| v. | [NO CHANGE IN JUDGMENT] |
| I.R. et al., | |
| Appellants. | |

APPEAL from orders of the Superior Court of El Dorado County, Steven C. Bailey, J.  Reversed.

Donna W. Furth, under appointment by the Court of Appeal, for Appellants.

Edward L. Knapp, County Counsel, Lesley B. Gomes and Lauren C. Bowers, Deputy County Counsel, for Plaintiff and Respondent.

1

THE COURT:

The opinion in the above-entitled matter filed on April 23, 2014, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in full in the Official Reports and it is so ordered.  There is no change in judgment.  **(*CERTIFIED FOR PUBLICATION*.)**


FOR THE COURT:


<u>          HULL              </u>, Acting P. J.


<u>          ROBIE            </u>, J.


<u>          BUTZ             </u>, J.