Filed 5/18/22  In re K.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re K.M., A Person Coming Under the Juvenile Court Law. | B315212 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.W., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK15577E) |

APPEAL from orders of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

K.W. (Mother) appeals from an order terminating parental rights over her daughter K.M. (Minor). We consider whether the juvenile court erred in declining to rely on the parental benefit exception to forego terminating Mother's parental rights. In addition, we consider whether the Los Angeles County Department of Children and Family Services (the Department) had a duty under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law to determine whether Minor's alleged father (not presumed father) S.A. has any Indian heritage.

## I.  BACKGROUND

In February 2016, one month before Minor was born, the Department filed a petition alleging Minor's four siblings were at risk of harm due to physical abuse by S.A. (the father of one of Minor's siblings), Mother's failure to protect her children from S.A., and a history of domestic violence between Mother and S.A. A month and a half after Minor's birth, the Department filed another petition, this one alleging Minor was at risk of physical harm because of the abuse and neglect suffered by her siblings, among other things. The juvenile court sustained the allegation that Minor was at substantial risk because her siblings had been abused, declared her a dependent of the court, and removed her from Mother's custody.

### A.    *Mother's Visitation and Relationship with Minor During Reunification*

From September 2016 to May 2018, Mother was provided with reunification services. During this period, Mother was consistent in her visitation with Minor, both when the visits were

3

monitored and later after she was granted unmonitored visitation. As reported by the foster family agency that initially served as the monitor, Mother's visits with Minor were "pleasant," with Mother playing music for Minor and reading to her from the Bible.

The Department reported Minor is "very close and affectionate towards her mother but she has also formed a bond with her caregiver." Notwithstanding the bond, the caregiver told the Department that Minor would "shut down" and refuse to interact with the caregiver for about an hour after visits with Mother. The caregiver also reported she felt "intimidated" by Mother when she (the caregiver) would come to pick up Minor at the end of a visit, and the foster family agency revealed Mother repeatedly violated the agency's pick-up rules and harassed the caregiver.

When the foster family agency declined to monitor any further visits, Department personnel took over the monitoring responsibility. According to the Department, Mother interacted and engaged "beautifully" with Minor during visits; "[t]hey play, they sing, they talk, they draw and communicate well in a loving manner. . . . Mother is affectionate and loving toward [Minor]. . . . Mother is very attentive to [Minor]. . . . [Minor] does not want to leave her Mother at the end of the visit."

During the reunification period from 2016 to 2018, Minor was placed in three different homes before being placed in the home of K.A. and O.A. (the foster parents) in August 2017; Minor was almost a year and a half old at that point. The Department reported Minor was a "happy toddler," who was "thriving" in the care of the foster parents, comfortable with them, and bonded to them. After less than a year of caring for Minor, the foster

4

parents informed the Department they would be willing to adopt Minor if she did not reunite with Mother.

In May 2018, the juvenile court terminated Mother's reunification services after finding her participation in her case plan had been "minimal." The court at that time expressed "serious and grave concern" about Mother's ability to protect Minor.

B.     *Mother's Visitation and Relationship with Minor*
       *Following the Termination of Reunification Services*

In the period immediately following the loss of reunification services, Mother remained consistent in her unmonitored visitation with Minor.  The foster parents reported Mother never missed a visit and was never late.  The foster parents also did not observe any "acting out" by Minor after her visits with Mother, though they did note Minor often returned home hungry.  The Department opined Minor "has affection for and comfort with" both Mother and the foster parents.

As more time passed, however, Minor's relationship with Mother deteriorated.  Minor repeatedly stated she did not want to visit Mother and wanted to stay with her "mommy," i.e., the foster mother.  At times, Minor would physically resist leaving the car to attend a visit with Mother—Minor would turn her head away from the opened car door; yell, scream, and shake her head when Mother approached the foster parents' vehicle; and refuse to leave her car seat.  Minor's protests would continue even when Mother and others would try to induce her to go with Mother through offers of gifts (clothes, toys, and money).  The foster parents also began reporting Minor engaged in inappropriate

5

conduct, such as hitting and cursing, after returning from overnight visits with Mother.

With the onset of the COVID-19 pandemic in the early part of 2020, Mother's visits with Minor were limited to voice and video communications. Those became more sporadic over time. On a regular basis, Mother would miss scheduled visits or would call anywhere from 30 to 60 minutes late. When Mother did call at the scheduled time, Minor routinely either refused to speak with her or, if she accepted the call, she would ignore Mother or abruptly terminate the call. Minor also hid and threw the foster parents' phone in attempts to avoid calls with Mother.[1]

During this same period, Minor's relationship with the foster parents grew stronger. The Department reported Minor was "happy," "thriving," and "comfortable," in the home of the foster parents with all her needs being met and enjoying a "trusting and loving" relationship with both foster parents. Minor identified the foster parents as "mom" and "dad." The foster parents "incorporated [Minor] in all of their family events and both their extended families have welcomed and accepted [Minor] into their respective families."

In advance of a permanency planning hearing in September 2021, the juvenile court asked the Department to report on Mother's visits with Minor in light of Mother's anticipated reliance on the parental benefit exception to law that otherwise

---

[1] Minor explained that the foster mother was her "mommy" and that she "d[idn't] want to talk to [her] other mommy." Minor confided to her therapist, to whom she was referred due to outbursts of anger arising from contact with Mother, that she feared being taken away from the foster parents.

6

requires termination of parental rights.[2]  The Department reported "Mother continues to call any time she feels like calling and ignores the arranged times for visits."  In addition, the Department advised that out of six observed calls, Minor quickly disconnected the call on five occasions, while on the sixth call Minor spoke with Mother for 22 minutes.  On a seventh occasion, the social worker waited 20 minutes for Mother to call but "to no avail."  The Department recommended the juvenile court terminate parental rights and proceed with adoption.

### C.      *The Juvenile Court Terminates Parental Rights*

On September 7, 2021, the juvenile court held a contested permanency planning hearing.  The court admitted two dozen reports submitted by the Department during the post-reunification period and a series of call logs from Mother's phone from late 2020 and early 2021.  Three percipient witnesses testified at the hearing: Mother, a Department social worker, and the foster mother.

Mother described having a healthy and happy relationship with her daughter prior to the pandemic.  During their in-person visits, "[w]e would play toys.  We sang.  We had lunch, breakfast, dinner.  I would bathe her.  I would hug her.  I would kiss her, tell her I love her."  Mother conceded, however, her relationship

---

[2]      The exception precludes termination of parental rights so as to enable the statutorily preferred outcome of adoption where the juvenile court "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)

with Minor since the onset of the pandemic was "not good." Mother had not had an in-person visit with Minor since May 2020, and her calls with Minor were "only for a few minutes" each. Under questioning from Minor's counsel, Mother admitted she did not always call at the appointed time and that some of her calls were terminated by Minor. During cross-examination by the Department's attorney, Mother admitted she played little role in attending to Minor's education or health after she was removed from Mother's custody.

The Department's social worker, who had been involved in Minor's case for almost five years (from September 2016 to July 2021), testified Minor had a "negative" reaction to Mother during all of the visits the social worker observed after Minor was no longer an infant. The social worker described how Minor would kick, scream, and contort herself inside a vehicle so as not to be forced to go on an unmonitored visit with Mother. The social worker characterized Mother's relationship with Minor as "flat" and lacking "any reciprocal bonding or reciprocal affection."

The foster mother, who had been caring for Minor for the last four years, explained Minor began physically resisting in-person visitation with Mother beginning around age two (approximately six months after she was placed in the foster parents' home) and that this resistance occurred almost "every single time" thereafter. When visitation shifted to video calls following the onset of the pandemic, Minor's resistance did not diminish (despite the foster mother's encouragement to the contrary) and took on a different form: terminating the call despite Mother's entreaties that she not hang up. The foster mother also confirmed Mother often missed scheduled calls or called well after the scheduled call time.

When the presentation of evidence concluded, Mother argued she had a bond with Minor and terminating Mother's parental rights would be detrimental to Minor. In particular, Mother emphasized the Department liberalized her visitation with Minor from monitored to unmonitored, and even allowed overnight visits, prior to the pandemic. The attorney for Minor disputed there was any significant bond between her client and Mother, relying on her client's adamant resistance to visits. Minor's counsel argued the parental benefit exception was inapplicable because Mother did not play a parental role in Minor's life, as shown, for instance, by Mother's failure to even inquire about Minor's education or health. The Department argued the exception did not apply largely for the same reasons.

The juvenile court made extensive findings on the record and ruled it would terminate Mother's parental rights. The court found the foster mother was "very credible" and the testimony by the social worker was not "terribly probative." The court found Mother was "credible," but the court believed her testimony did not suffice to establish the parental benefit exception.

The court highlighted the visitation problems between Mother and Minor, relying both on the deterioration of the frequency in visitation and the pronounced shift in Minor's feelings from seeking "affection and comfort" from both Mother and the foster parents to resisting any contact or communication with Mother. The court believed the lack of consistent visitation was a "threshold" finding that alone established Mother did not meet her burden to invoke the parental benefit exception, but for the "sake of thoroughness," the court also addressed other reasons why Mother did not satisfy the exception's prerequisites.

First, the court found Minor and Mother did not enjoy a beneficial relationship because there was "no evidence in the record that [Minor] enjoyed her visits with her mother or in any other way received a benefit." Second, the juvenile court believed "the facts did not support a finding that [termination of parental rights] would be a detriment to [Minor]" because Mother did not play a "parental role" in Minor's life and because there was an insufficient showing that "the strength and quality of the parent-child relationship outweighs the security and sense of belonging in a stable family."

## II. DISCUSSION

Substantial evidence supports the juvenile court's finding that Mother did not maintain regular visitation and contact with Minor. Mother's pattern of visitation following the onset of the pandemic was inconsistent: she frequently missed scheduled calls or called well after the scheduled time, and there was no evidence that the many missed and late virtual visits were due to technical difficulties or other problems beyond Mother's control. The lack of regular visitation, especially when combined (though not necessarily combined) with the evidence indicating Mother's infrequent contact with Minor did not result in a significant, positive attachment between the two, establishes the juvenile court was correct to find the parent-child relationship exception inapplicable. (*In re Caden C.* (2021) 11 Cal.5th 614, 631 ["From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child"] (*Caden C.*); see also *In re I.R.*

10

(2014) 226 Cal.App.4th 201, 212 [regular visitation "did not occur here and its lack would fatally undermine any attempt to find the beneficial parental relationship exception"].)

There is also no ICWA error in this case. The Department was not required to undertake an investigation into whether alleged father S.A. had any Indian ancestry on the facts here.

> A. *Substantial Evidence Supports the Determination that Mother Did Not Regularly Visit and Contact Minor*

As just explained, a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things," one of which is "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C.*, *supra*, 11 Cal.5th at 636.) Visits and contact are important in this context because they can "'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [citation] but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child." (*Id.* at 632; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent"].) The juvenile court found this element was not met and we review that finding for substantial evidence. (*Caden C.*, *supra*, at 639.)

It was undisputed that over the course of the year and a half preceding the permanency planning hearing, Mother's record

11

of visitation was marred by a large number of missed and/or significantly late virtual visits. The juvenile court was entitled to infer from the lengthy list of missed and tardy calls that technological issues were not the cause of Mother's inconsistent visitation—indeed, there was no evidence to the contrary. Moreover, even after Mother was on notice that the Department was observing her virtual visits at the juvenile court's direction for the purpose of determining the applicability of the exception, she continued to miss scheduled times for virtual visits.

There was also evidence that Mother's inconstant visitation did not continue or develop a significant, positive, emotional attachment between Mother and Minor. Even before the onset of the pandemic, Minor resisted visitation with Mother once she (Minor) was no longer an infant. Then, after visits changed to telephonic and video calls, Minor continued to resist visits with Mother by hiding and throwing the foster parents' phone, ignoring Mother while on a call or abruptly terminating the call, and wondering aloud why Mother was calling her.

Mother's argument that her visitation should nevertheless be deemed sufficient for purposes of the parental benefit exception because she was consistent in her visitation during the first two years of the dependency proceeding misses the mark for two reasons. First, we assess the regularity of the visitation throughout the entire course of the dependency proceedings, and where visitation has declined to the point of sustained irregularity by the time of a parental rights termination hearing, that will preclude successful invocation of the parental benefit exception. Second, even if it were true that a period of earlier regular visitation could overcome a period of later irregular visitation (though the converse seems a far more persuasive

12

proposition), we still operate under the constraints of substantial evidence review.  Under that standard, we affirm even when there is "'evidence to the contrary [that] also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, *supra*, 11 Cal.5th at 640.)  That would be the case here.

### B.    *The Department Was Not Obligated to Investigate S.A.'s Family History for ICWA Purposes*

When the Department instituted dependency proceedings on behalf of Minor, Mother identified S.A. as the child's father.  S.A., however, was not listed as the father on Minor's birth certificate, he was not present for Minor's birth, and he told Mother not to claim him as Minor's father.

At the initial detention hearing, the juvenile court found S.A. to be Minor's alleged father only.  That finding remained unchanged throughout the course of the dependency proceedings.  In 2016, after initial inquiries into Mother's possible Indian heritage, and again in 2021, after more extensive inquiries, the juvenile court found ICWA inapplicable.  Mother contends the ICWA findings are infirm because the Department did not inquire into S.A.'s possible Indian ancestry.

The trial court's ICWA findings are not erroneous.  ICWA excludes "any unwed father where paternity has not been acknowledged or established" from its definition of a "parent." (25 USC § 1903(9); see also *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707-709 [affirming termination of parental rights because alleged father lacked standing to appeal under ICWA's definition of "parent"].)  S.A. has not acknowledged Minor as his daughter, nor has his biological paternity been established.

13

Under the circumstances here, reversal is not warranted.  (See, e.g., *In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 [ICWA's notice procedures were not triggered when the alleged father's paternity test revealed he was not the biological father of minor]; compare *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1166 & fn. 5 [ICWA inquiry and notice requirements triggered because the minor's birth certificate designated father as the biological father].)

DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.

14