Filed 3/11/25  In re S.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>T.W.,<br><br>        Defendant and Appellant. | A170448<br><br>(San Francisco City & County Super. Ct. Nos. JD223279, JD223279A, JD223280) |

T.W. (mother) appeals from the juvenile court's order terminating her parental rights to her children, S.B. and Princeton (minors), at a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Mother argues the juvenile court erroneously declined to apply the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i).  We find no error and affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

# I. BACKGROUND

## A. *The Parties*

Mother gave birth to S.B. in October 2016, and Princeton in March 2018. S.B. and Princeton share a biological father, Steven B., who was not involved in minors' upbringing, and is not party to the appeal. After suffering birth complications from having his umbilical cord wrapped around his neck, Princeton was later diagnosed with cerebral palsy.

On September 16, 2021, emergency responders responded to the family home, finding then three-year-old Princeton unconscious and having difficulty breathing. He was intubated and transported to UCSF Benioff Children's Hospital Oakland, and ultimately admitted to the Pediatric Intensive Care Unit, where doctors diagnosed a large forehead hematoma, a lacerated liver, bruising on his chest and back, and minimal brain activity. His extensive injuries were consistent with multiple instances of non-accidental trauma. Princeton was at high risk of not surviving his injuries, or at a minimum being in a long-term vegetative state due to his extensive brain injuries.

Hospital staff reported Princeton's injuries to Contra Costa County Children & Family Services (CFS). Law enforcement went to mother's home to investigate Princeton's non-accidental injuries and social workers interviewed mother, mother's then-boyfriend Datrius B., and then four-year-old S.B. Based on its findings, CFS detained S.B. and Princeton, bringing them into protective custody. S.B. was placed with an approved emergency resource family home, while Princeton remained hospitalized.

On September 21, 2021, CFS filed a petition for Princeton under sections 300, subdivisions (a), (b), and (e), and for S.B. under sections 300, subdivisions (b)(1) and (j). The juvenile court found "detention [was] necessary to prevent imminent physical damage or harm" to the children and

2

barred mother's visitation rights to S.B., while permitting supervised visits with Princeton while he was hospitalized. At the October 27 jurisdictional hearing, the juvenile court sustained the section 300 petitions as pled.

Weeks after the jurisdictional hearing, mother gave birth to her third child, Priscilla, in November 2021.[2] When interviewed, mother refused to provide CFS with any details about Priscilla's birth or location. Approximately one month after her birth, CFS located Priscilla with mother's relatives in Bakersfield and subsequently brought her into protective custody, placing her in the same resource family home as S.B.

CFS submitted multiple status reports before the October 24, 2022 dispositional hearing. In an initial report submitted before a January 5, 2022 hearing, CFS reported S.B. suffered from various trauma responses and was referred to therapeutic services because of her witnessing domestic violence. During two forensic interviews, S.B. described how she and Princeton had been hit by mother.

CFS also reported that mother participated in weekly in-person supervised visits with S.B. as permitted, which transitioned to virtual visits after mother hid Priscilla's birth and location from CFS. Although these visits were generally appropriate, CFS noted that after a visit in late 2021, S.B. voluntarily disclosed to the visitation supervisor that her " 'daddy' killed her brother" and herself. Princeton was still hospitalized, but had been transferred from the Pediatric ICU to the rehabilitation unit. Mother had supervised visits with Princeton at the hospital, which were reportedly appropriate. However, CFS recommended mother not receive reunification

---

[2] Priscilla's father is Datrius B., making Priscilla the younger half-sister of S.B. and Princeton. Mother does not appeal the termination of her parental rights as to Priscilla.

services for Princeton and S.B. pursuant to section 361.5, subdivisions (b)(5) and (b)(6).

In a status update before a May 2, 2022 hearing, CFS continued to recommend no reunification services. Princeton was discharged on January 4, 2022, and placed in a foster home under the care of a healthcare professional in Sacramento County. Mother continued to participate in supervised, in-person, 90-minute visits with Princeton every other week, with virtual visits on the alternating weeks. While mother's behavior was appropriately attentive and affectionate, CFS noted it was difficult to assess Princeton's reactions to mother's visits. S.B. remained in the same Contra Costa County placement with Priscilla, where mother participated in weekly two-hour visits. Mother would bring food and toys, and S.B. would watch videos and sing and dance, throwing minor tantrums when she did not want to do something, when visits were about to end, or when there were inconsistencies with how visits proceeded.

Before an October 24, 2022 hearing date, CFS submitted a status update with a new recommendation that reunification services be ordered for mother and a request that the case be transferred to the Human Services Agency (Agency) in San Francisco County, where mother was living. CFS reported mother had demonstrated significant progress, such as attending parenting classes and therapy, working towards her GED, and obtaining employment and stable housing.

S.B. remained in the same resource family home placement with Priscilla, where mother continued to participate in weekly two-hour supervised visits. Mother did not miss any in-person visits unless the children were sick, in which case she would request that the visits be conducted virtually. Mother's visits were reportedly good; she was attentive

4

and affectionate with the children, and CFS noted that it was considering allowing mother to participate in unsupervised, overnight visits. S.B. was enrolled in therapy to address her PTSD and emotional issues. Princeton had undergone two additional surgeries and was now completely dependent on an extensive medication routine and a full-time caregiver to attend to his medical needs. Princeton's severe physical abuse resulted in his permanent disability, with diagnoses of spastic quadriplegia, dysautonomia, traumatic brain injury, impaired mobility, and communication deficits. He also required a gastrostomy tube for nutrition and a ventriculoperitoneal shunt to drain extra cerebrospinal fluid. Mother continued to have alternating 90-minute supervised, in-person visits and virtual visits each week with Princeton. She did not miss any in-person visits unless there were transportation delays, but declined opportunities to have additional visits with Princeton. CFS noted mother would need to dedicate more time with Princeton, his caregiver, and the medical team to learn how to properly care for Princeton.

During the October 24, 2022 hearing, the Contra Costa juvenile court maintained S.B.'s and Princeton's status as dependents and ordered that reunification services, including visitation, be provided to mother. The court also transferred the matter to San Francisco County due to mother's change in address.

Before a combined 6/12/18-month review hearing, the San Francisco juvenile court received multiple status reports. Prior to a hearing originally set for April 20, 2023, social worker Chabrika Bowers submitted a status review report recommending that the court terminate mother's reunification services and set a section 366.26 hearing. S.B. and Priscilla still lived in the same resource family home placement, and Princeton remained in a separate

5

placement with his medical caregiver. Princeton remained completely reliant on 24-hour care. Mother continued to consistently attend alternating supervised visits with Princeton, either in person or virtually, but reportedly struggled with affection and connection and did not show a sensitivity to Princeton's needs. And although Princeton was alert and reactive during other interactions, he kept his eyes closed during in-person interactions with mother and the visitation supervisor believed that he may have felt unsafe. By contrast, mother was affectionate and engaged during her weekly supervised visits with S.B. S.B. had indicated she wanted to be reunited with Princeton, with whom she had not had contact for approximately 13 months prior to the case being transferred to San Francisco. After social worker Bowers explained to S.B. that Princeton had mobility limitations, S.B. seemed to recall and recount memories of past abuse by mother and Datrius B.

Before a continued August 17, 2023 hearing date, social worker Bowers submitted an addendum report, continuing to recommend termination of mother's reunification services and a reduction in mother's visitation. Mother now participated in twice-a-week visits with S.B. and Princeton, where she would focus and engage primarily with S.B. Bowers was concerned mother would not be able to emotionally support S.B. Mother had become affectionate toward Princeton, but he remained withdrawn. Mother continued to present as indifferent and detached from the children. But the siblings had reconnected, resulting in positive reactions from S.B. and Princeton.

At the contested combined 6/12/18-month review hearing on August 17, 2023, the juvenile court found mother's progress was minimal and minors could not be safely returned to mother; the court therefore terminated

6

reunification services and set a section 366.26 hearing. The court also reduced mother's visitations to one hour per month, then to one hour per every six weeks. Mother failed to file a writ petition to challenge the termination of reunification services and the setting of the section 366.26 hearing.

**B.** *Section 366.26 Hearing*

On May 1, 2024, the juvenile court conducted a contested section 366.26 hearing. Before the contested hearing, social workers Bowers and Elana Maslow submitted reports recommending that the court terminate mother's parental rights to S.B., Princeton, and Priscilla, and set adoption by the children's caregivers as a permanent plan. S.B. remained in placement with Priscilla and was continuing therapy. Mother consistently visited S.B. and read books with her. However, mother had difficulty maintaining boundaries with S.B. S.B.'s therapist noted that S.B. had nightmares about not seeing her mother again, but could not follow up with S.B. to confirm her feelings, and the therapist was concerned that S.B.'s perceptions might have been impacted by viewing her foster sibling's experiences as her own. Indeed, social worker Bowers noted S.B. did not display any emotional response after being informed of mother's reduced visitation and contact. As to Princeton, Bowers noted that although mother was more affectionate and attentive to Princeton, she sometimes appeared smothering and was unaware how her behavior caused Princeton physical harm by causing breathing issues. Princeton remained relatively non-responsive during mother's visits. Bowers indicated that she did not believe Princeton would suffer detrimental impact if contact with mother stopped.

At the hearing, social worker Bowers, social worker Maslow, and mother testified. Bowers testified the children displayed no negative response to the reduction in mother's visitation. She reported on Princeton's

7

non-responsiveness to mother and testified that he likely did not feel comfortable with her. Although Bowers provided mother with documentation from Princeton's provider, mother never initiated receiving additional information about Princeton's progress. Bowers believed mother "just did not focus on the kids." Moreover, Princeton's caregiver was committed and prepared to raise and care for Princeton. As to S.B., Bowers testified that "it would be a detriment" to split her and Priscilla up, given their close relationship and existing living situation together.

Social worker Maslow confirmed that the Agency's recommendation for Princeton had changed from legal guardianship to adoption, and reaffirmed that Princeton's caregiver was dedicated and committed to properly caring for Princeton and keeping him connected to his sisters. Maslow confirmed that Princeton and S.B. are specifically adoptable. She believed there would be no detrimental impact to Princeton or S.B. if mother's parental rights were terminated, in part because both children were being cared for and had built strong relationships with their placement families.

In her testimony, mother disagreed with the social workers, arguing she was an affectionate and "passionate" mother with good relationships with her children, whose parental rights should not be terminated because she was a "very good mother" who has "shown up for them since day one, and . . . very capable of taking care of [her] children."

After considering the Agency's status reports and the witnesses' testimony, the juvenile court found by clear and convincing evidence that S.B. and Princeton would likely be adopted within a reasonable time, designated their caregivers as the prospective adoptive parents, and terminated mother's parental rights.

The court agreed that there was "clear and convincing evidence that it is likely each of these children will be adopted within a reasonable amount of time."[3]  The court then held that "the beneficial [relationship] exception just doesn't apply here."  The court acknowledged "there's an argument that there have been regular visits" by mother as per the first prong, but found that "the second prong of the beneficial relationship exception has not been made" by mother.

The juvenile court concluded that despite S.B.'s existing relationship with the mother, "terminating that relationship between [S.B.] and the mother would not be detrimental."  The court noted that "[S.B.] considers her caregiver her mom also and calls her mom."  Indeed, the court determined that the relationship between S.B. and mother "has had a negative impact . . . in that it has caused [S.B.] to be parentified in a way that she has become a mother to Priscilla given the way [mother] has acted in front of [S.B.] to Priscilla."  And "the rational, reasonable conclusion" the court could make regarding mother's preferential treatment of S.B. and her "lack of affection for Princeton and Priscilla" is that it "caused a detriment in some ways to [S.B.]"

Regarding Princeton, the court found that "[m]other has never really focused on her children and how they're doing," and "has acted as though Princeton was interacting with her," which the court found untrue.  The court concluded that mother "sadly has a lack of awareness of how to interact with some of her children."  The court also made "a credibility finding today in

---

[3] The court did not specify whether it found the children to be generally or specifically adoptable, stating that it need only "find by clear and convincing evidence that the [children are] likely to be adopted within a reasonable time" to terminate parental rights.  Mother does not challenge this determination.

favor of Bowers and in favor of Maslow, not in favor of [mother]," noting in particular that Bowers had been "extremely professional . . . and credible."

## II. DISCUSSION

### A. *Legal Principles and Standard of Review*

At a section 366.26 hearing, the goal is "specifically . . . to select and implement a permanent plan for the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) Only in "exceptional circumstances" may the court "choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i) is meant to cover parent-child relationships that "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The exception "must be examined on a case-by-case basis," considering the many variables that may affect the parent-child bond. (*Id.* at pp. 575–576.)

To satisfy the exception, "a parent must prove *all three* components of the beneficial relationship exception," and a "failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10.) The parental-benefit exception requires a parent to establish by a preponderance of the evidence that (1) "the parent has regularly visited with the child," taking into account the extent of visitation permitted; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 629, 636 (*Caden C.*); § 366.26, subd. (c)(1)(B)(i); *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) The first element asks whether there has been regular visitation.

10

"Regular visitation exists where the parents visit consistently and to the extent permitted by court orders," not merely that there have been parental visits. (*In re I.R., supra,* 226 Cal.App.4th at p. 212.) The second element asks whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The relationship may be impacted by several factors, such as the "age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)

We review the juvenile court's findings on the first two elements for substantial evidence, wherein this court will uphold the trial court's determinations if we find substantial evidence supporting the juvenile court's finding, " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C., supra,* 11 Cal.5th at p. 640.)

With respect to the third element, we review the factual determinations underlying the juvenile court's balancing for substantial evidence, e.g., "rang[ing] from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features." (*Caden C., supra,* 11 Cal.5th at p. 640.) However, the "ultimate decision" of whether termination of parental rights would be detrimental to the child requires the trial court to "engage in a delicate balancing" and exercise its discretion. (*Ibid.*) The third element is thus properly reviewed under the abuse of discretion standard, wherein the trial court's decision will be overturned only if the decision " ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at pp. 640–641.) This hybrid standard "embodies the principle that '[t]he

statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Id.* at p. 641.)

## B. *Analysis*

Mother's sole argument on appeal is that her parental rights should not have been terminated because the juvenile court should have found that she satisfied all three prongs of the parental-benefit exception. We disagree, as mother has failed to satisfy the second and third prongs regarding S.B. and all three regarding Princeton.

### 1. Regular Visitation

The juvenile court did not make a specific finding on the first prong of the parental benefit exception, but acknowledged that "there's an argument that there have been regular visits by" mother. Mother and Agency agree that mother regularly and consistently visited S.B.

Mother's visitation with Princeton, however, was more limited. Mother participated in only two visits in the nearly nine months between August 17, 2023 (when the court terminated reunification services) and the section 366.26 hearing on May 1, 2024—once in-person on November 17, 2023, and once over Zoom on March 5, 2024. When considering the extent of visitation permitted, which allowed mother to have supervised visits at least every six weeks, she could have attended at least five visits with Princeton during that period. (*In re I.R., supra,* 226 Cal.App.4th at p. 212.) Mother's two visits with Princeton in a period of approximately nine months thus suggests that we could affirm the juvenile court's termination of mother's parental rights as to Princeton based solely on her lack of regular visitation with him. But even if we assume the first prong was met as to both children, mother would still

not be entitled to reversal because she fails to show error with respect to the second and third prongs.

## 2. Children's Benefit from Continued Relationship

The juvenile court found that "the second prong of the beneficial relationship exception has not been made by" mother as to both S.B. and Princeton. Substantial evidence supports the juvenile court's determination on the second prong, when considering factors such as the portion of the child's life spent in parental custody and the child's particular needs. (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)

As noted, the juvenile court found that mother's relationship with S.B. had a negative impact "in that it has caused [S.B.] to be parentified in a way that she has become a mother to Priscilla given the way [mother] has acted in front of [S.B.] to Priscilla." Social worker Bowers noted that during supervised visits with S.B. and Priscilla, mother would pay more attention to S.B., while minimally interacting with Priscilla. Indeed, mother acknowledged that Priscilla sought out S.B., instead of mother, for her "immediate needs." S.B.'s therapist also noted that mother would likely be unable to support S.B. in therapy and chose not to include her. In addition, Bowers testified to mother's "lack of affection towards Princeton," such as failing to help him feel comfortable and being cognizant of his responses to her, which the juvenile court concluded "caused a detriment in some ways to [S.B.]." The record reflects that S.B. witnessed extensive and severe abuse of Princeton by mother and Datrius B., even believing that Princeton had died. And when S.B. learned of mother's reduced visitation, she did not react negatively and there is no indication she suffered any subsequent negative impact.

There is also substantial evidence supporting the court's finding that Princeton would not benefit from a continued relationship with mother.

13

Bowers testified that during mother's occasional visits with Princeton, mother ignored his signs of discomfort—i.e., the fact that he kept his head down and eyes closed when with her. Although she became more affectionate over time, there was also evidence that mother, albeit inadvertently, caused Princeton physical harm in that her behavior limited his ability to breathe. There were also questions about mother's commitment to learning how to properly care for Princeton, with CFS noting that mother would need to spend more time with Princeton and his team to properly care for him, yet also noting that mother declined to have additional visits with him. And although mother "has acted as though Princeton was interacting with her," the juvenile court found that "to be not true," affirming the credibility of Bowers' testimony. Moreover, S.B. and Princeton have been in protective custody since late 2023. Given their young ages, this has been a significant portion of the children's lives.

Mother cites to evidence positively reflecting on her visits with the children. However, under the substantial evidence standard of review, the court looks for substantial evidence supporting the juvenile court's finding, regardless of substantial evidence against it. (*Caden C., supra,* 11 Cal.5th at p. 640.) There is substantial evidence supporting the juvenile court's finding the children would not benefit from a continued relationship with mother.

### 3. Detrimental Impact of Terminating the Parental Relationship

Turning to the third prong, the juvenile court concluded that terminating S.B.'s parental relationship with mother "would not be detrimental."[4] This determination is supported by Maslow's testimony that

---

[4] The juvenile court did not make a specific finding on the third prong regarding Princeton.

termination of mother's parental rights would not have any negative consequences for S.B. The record reflects that S.B. is "very comfortable and supported" in her adoptive home and that she "has a very close, strong relationship with her caregiver, a strong bond, and calls her mom." These considerations "factored" into the juvenile court's reasoning that the beneficial relationship exception did not apply.

The testimony of the two social workers also provides substantial evidence supporting the juvenile court's finding that "[m]other has never really focused on her children and how they're doing," and "sadly has a lack of awareness of how to interact with some of her children." As previously noted, the court disbelieved mother's testimony that Princeton was interacting with her during visits, and the record reflects that Princeton was not responsive toward mother during her visits with him. Moreover, social worker Maslow testified that terminating mother's parental rights would have no negative repercussions for Princeton "because Princeton is also in a home where he is taken really good care of."

Mother highlights evidence reflecting her care for both children, such as playing with and visiting S.B. and calling the hospital daily to check on Princeton while he was hospitalized. Notwithstanding mother's efforts in some aspects of her relationship with minors, the agencies' reports and the social workers' testimony demonstrates that it was not arbitrary, capricious, or patently absurd for the juvenile court to hold that any detrimental impact to S.B. and Princeton from terminating mother's parental rights would not outweigh the benefits of permanent adoption.

Given the witnesses' testimony and the lengthy written record, which was "read thoroughly and considered" by the juvenile court, we reject

15

mother's contention that the juvenile court abused its discretion in failing to apply the parental-benefit exception.

## III. DISPOSITION

The juvenile court's order is affirmed.

_____
Brown, P.J.

WE CONCUR:

_____
Streeter, J.

_____
Simonds, J.[*]

---

[*] Judge of the Sonoma County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.