Filed 11/15/22  In re Star K. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re STAR K., a Person Coming Under the Juvenile Court Law. | B317477 (Los Angeles County Super. Ct. No. 18CCJP08194) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SHANNON K., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Conditionally affirmed and remanded with directions.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Shannon K. (Mother) appeals from the juvenile court's order terminating her parental rights over four-year-old Star K. under Welfare and Institutions Code section 366.26.[1] Mother contends the juvenile court erred in finding the beneficial parental relationship exception to termination of parental rights did not apply. Mother also contends the Los Angeles County Department of Children and Family Services (Department) and the juvenile court failed to comply with the inquiry and notice provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and related California law.

The juvenile court did not abuse its discretion in finding the beneficial parental relationship exception did not apply. However, the Department and the juvenile court failed to comply with the inquiry and notice provisions of ICWA and related California law, and the error was prejudicial. We conditionally affirm and remand for the juvenile court and the Department to comply with ICWA and California law.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

# FACTUAL AND PROCEDURAL HISTORY

A.  *The Referral, Dependency Petition, and Detention*

On November 29, 2018 the Department received a referral alleging general neglect and emotional abuse of one-year-old Star by Mother and Shane K. (Father).[2]  The referral alleged Mother and Father were living in a small hotel room with Star, were current users of methamphetamine, and fought with each other in Star's presence while under the influence of drugs.  On the day of the referral, a social worker visited the hotel and interviewed Father.  Father stated he and Mother recently had a verbal altercation during which Mother threw a cell phone, but he denied physical violence between them.  After some equivocation, Father stated he used "'dope and marijuana,'" and Mother also used "'dope.'"

On November 30 the social worker interviewed Mother, who stated she was unhoused and Father had previously abandoned her and Star for three weeks.  Mother admitted she and Father would "'yell and get loud,'" but she denied any physical violence between them.  Star had no visible marks or bruises.  Mother denied using drugs, stating she had been "'clean for about two years,'" and Father only smoked marijuana.

On December 26 the Department filed a dependency petition on behalf of Star alleging under section 300, subdivision (b)(1), that Father had a history of substance abuse

---

[2]  Father did not appear in the juvenile court proceeding and is not a party to the appeal.  The Department filed declarations of due diligence in August 2019 and April 2021 detailing its unsuccessful efforts to locate Father, who is reported to be unhoused.

and was a current abuser of methamphetamine and marijuana, and Mother was a current abuser of illicit drugs including methamphetamine, which rendered both parents incapable of providing regular care and supervision of Star and placed Star at risk of serious physical harm. The petition also alleged Mother failed to protect Star from Father's substance abuse by allowing Father in the home with access to Star. At the December 27 detention hearing, the juvenile court[3] detained Star. The court ordered monitored visitation for Mother with on-demand drug testing.

B.     *The Jurisdiction and Disposition Hearing*

At the time of the January 18, 2019 jurisdiction and disposition report, Mother was living with the maternal grandparents. Star's caregiver, Amy O., reported Mother visited with Star one to two times per week for two hours per visit. During these visits, "Star goes to mother when she sees her, and mother engages appropriately with [S]tar." On December 28, 2018 Mother tested positive for methamphetamine (after failing to show up for November 30 and December 17 tests). Mother admitted she used methamphetamine on the day of the positive test but denied she used it at any other time in the prior three years, asserting she was so "'hopeless'" at having Star taken away that she used drugs one time. On about January 4, 2019 Mother again tested positive for methamphetamine.

---

[3]     Juvenile Court Referee Robin R. Kesler.

4

At the February 8, 2019 jurisdiction and disposition hearing, the juvenile court[4] sustained the allegations of the petition under section 300, subdivision (b)(1), and declared Star a dependent of the court. The court found Father's statements to the social worker that he and Mother used drugs to be "highly credible" and Mother's excuses for her positive drug tests, that her positive tests were due to her use of a decongestant, were not credible. The court also found "ongoing volatility" between Mother and Father and they threw things during their arguments. The court concluded, "[T]here's a nexus between methamphetamine use here, [and] risk of serious physical harm. Not only is this a child of tender years with parents using while taking care of her, but also the use itself brings about volatility and violence that places the child at risk of serious physical harm."

The juvenile court removed Star from Mother's and Father's custody and ordered reunification services for Mother with monitored visits for a minimum of two times per week for two hours each visit. The court further ordered Mother to complete a full drug/alcohol treatment program with aftercare, 12-step program with court card and sponsor, parenting classes, and individual counseling, and to submit to weekly random and on-demand drug/alcohol testing. At the Department's request, the court admonished Mother the proceedings were confidential and she should not post about the proceedings on social media. Mother appealed the jurisdiction findings and disposition order,

---

[4]    Judge Kim L. Nguyen presided over the jurisdiction and disposition hearing and the six-month review hearing.

and we affirmed. (*In re Star K.* (Feb. 24, 2020, No. B297510 [nonpub. opn.].).)

C.    *The 2019-2020 Reunification Period*

The July 16, 2019 status review report stated Mother was having regular visits with Star at least twice a week for two hours each visit, and Mother was attentive during the visits and interacted well with Star. Mother would often play with Star at a park, and Star was excited to see Mother. Mother also spoke to Star daily on the phone. Visitation monitors observed that Mother could be "'abrasive'" and "'a little overbearing,'" and Mother posted severe criticism of the Department and the juvenile court on social media, including posts that identified social workers by their full names and included videos of other foster children in Amy's care. Mother tested positive for methamphetamine on February 14, April 23, and May 1, 2019, and she failed to test on four other occasions. Mother did not provide proof of enrollment in any services.

On January 17, 2020 the Department reported Star was doing well in her placement with Amy. Star was a "happy child," as was evident from "her constant smiling, giggling, and playful interaction." Mother continued to have twice weekly monitored visits for two hours per visit. The visits were "going well," and "Mother interact[ed] well with Star and Star respond[ed] positively." Mother displayed affection and took initiative to feed and change Star.

At a March 16, 2020 visit Mother became upset because Star kept going to Amy, not Mother. Mother had a "'melt down'" in front of Star and started cursing and yelling, then used her keys to destroy a leather couch in the visitation room. Amy

6

reported "Star became upset while witnessing her mother's behavior." Mother left the visitation facility, and when staff did not allow her to reenter, Mother waited in the parking lot for three hours. As a result, staff had Amy and Star leave the facility through the back door.

As a result of the COVID-19 pandemic, in March 2020 Mother started having daily virtual visits with Star. On September 4 the social worker reported that Mother had been recording her virtual visits with Star and posting them on her public social media account. The videos showed Amy, her home, and other children in the home. Amy was no longer willing to serve as Star's caregiver or to monitor virtual visits. Mother continued to criticize and post threats against the Department and social workers on social media, and it became difficult to provide a monitor for visits.

On September 18, 2020 Star was placed with Mr. and Mrs. C. (the caregivers). On September 23 the caregivers reported Star was doing well and sleeping through the night. During a virtual visit with Mother, Star attempted to show Mother her toys, but Mother did not want to see them, and Star became sad and put her head down. Mother became upset when Star called the caregivers "mom" and "dad," and she told Star not to call them that. On September 30 the caregivers reported the virtual visits were usually uncomfortable: Star did not look at Mother during a recent visit, and Mother called Star a "little brat." Mother told Star, "'I wish you were back at Amy's, because you didn't act like this.'"

At the October 8, 2020 12-month status review hearing, the juvenile court[5] found Mother had not made substantial progress with her case plan, terminated Mother's family reunification services, and set a selection and implementation hearing (§ 366.26).

D.    *Post-reunification Period and Selection and Implementation Hearing*

The January 27, 2021 section 366.26 report[6] identified the caregivers as prospective adoptive parents and stated they were meeting Star's needs. They lived in a house with one adopted daughter and room for Star, and they were eager to adopt her. Mother continued to have virtual visits with Star because the Department's offices were closed due to the COVID-19 pandemic. In addition, the caregivers and the foster agency did not want to participate in in-person visits due to Mother's prior violent behavior in front of Star and continuing social media postings.

On March 15, 2021 the Department reported Star was engaged with Mother through the majority of Mother's twice weekly virtual visits, but sometimes Star became distracted and disengaged, and the caregivers would need to redirect her attention to Mother. The caregivers later reported that "[d]uring most calls (with help and prompting), Star will share what she

[5]    Judge Debra R. Archuleta presided over the 12-month status review hearing and subsequent proceedings.

[6]    The selection and implementation hearing was initially set for February 4, 2021. At the February 4 hearing, the juvenile court granted Mother's request to represent herself. However, the selection and implementation hearing was continued multiple times to December 7, 2021.

did during the day and what she ate.  Star will also ask mom to play songs or videos from her phone."  But "[t]here have been times when Star does not want to participate in the visit," and "Star will not look at the screen or speak to her mom."

On May 12, 2021 the Department reported Star was speaking a great deal more and was engaged in educational play.  She was also participating in therapy.  Mother continued to have virtual visits.  On May 25 the caregivers reported, "Star is very vocal on the calls and tells her mom what she wants do, such as reading, singing, counting, ABC's."  However, "if Star doesn't get her way with mom, she shuts down and no longer wants to participate in the visit."  The caregivers reported Star was very "comfortable and happy" and "loving and affectionate" with them, and she enjoyed activities such as running, riding her scooter, singing, and dancing.

On September 20, 2021 the Department reported Star continued to grow and thrive in the caregivers' home, and she enjoyed going to the park, riding a tricycle and playing outdoors.  She had begun preschool and demonstrated confidence in her interactions with other children.  In July 2021 Star resumed in-person visits with Mother once a week, in addition to one weekly virtual visit.  The in-person visits were "going well":  Star appeared comfortable in Mother's presence and was "talkative and engaged."  Mother brought toys and activities, and they played together.  Mother was attentive and interacted well with Star.  At the end of each visit, Star helped to clean up and gave Mother a hug goodbye.  Star did not demonstrate any acting-out behaviors before or after the visits.  However, on August 23 Mother again posted a video of her visit with Star on social media.  The November 30, 2021 last minute information for the

court stated there were no concerns about the in-person visits. However, the Department recommended the juvenile court terminate parental rights and select adoption as Star's permanent plan.[7]

At the December 7, 2021 selection and implementation hearing (§ 366.26), the juvenile court admitted the Department's reports into evidence.[8] Star's attorney supported the Department's request to terminate parental rights, arguing there was clear and convincing evidence Star was adoptable, and the beneficial parental relationship exception did not apply. Further, although Mother had regular visitation with Star, the evidence did not support a finding Star's relationship with Mother "promotes the wellbeing of the child to such a degree as to outweigh the wellbeing the child would gain in a permanent home with new adoptive parents." Star's attorney also argued Mother had "not been able to establish a parental role in Star's life."

Mother, who was self-represented, argued she had been in an abusive relationship with Father but had succeeded in getting

[7] On October 13, 2021 Mother filed a section 388 petition seeking Star's return, in which she alleged she was testing negative for drugs and attending therapy, classes, and AA meetings. The juvenile court denied the petition on November 8, 2021. Mother did not appeal from the denial of her section 388 petition.

[8] Mother objected to admission of the Department's exhibits, stating she had not seen the exhibit list and did not know what a "last-minute report" was. The juvenile court provided Mother with a copy of the exhibit list and November 30, 2021 last minute information for the court before inviting argument.

10

him out of her life, relieving her emotional and physical pain, and she was "ready to do whatever it takes to get Star back." Mother also argued that Star should be placed in the home of the maternal grandparents instead of being adopted, although she acknowledged she had never asked the Department to assess the grandparents for a potential placement.

The juvenile court found Star was adoptable. When the court asked Mother if she was asserting the "parental-bond exception," Mother responded, "I don't know what that means." However, after further questioning, Mother acknowledged she was "claiming that there's a bond with" Star. The court found the exception did not apply, explaining, "Although there's been some regular visitation, it's been virtual visits for approximately twice a week. No other family members, including the grandparents, have ever had any visitation or interaction with Star and there's never been a request." Further, "the benefit accruing to the child from her relationship with the mother and the father is outweighed by the physical and emotional benefit that she will receive through the permanency and stability of adoption, and that adoption is in the best interest of the child." The court noted Star was then four years old and had been removed from Mother three years earlier. The court added that it did not appear "that Mother stands in the role of a parent, nor does she play a parental role to Star at this time." Further, the court found Star does not have "a significant emotional attachment" with Mother and the benefit of adoption "outweighs the quality and the nature of the relationship between Mother and minor." Finally, the court found "there would be detriment to the minor to be removed from the stable placement that she has been participating in

11

since she was approximately one year old."[9] The court found no exception applied, and it terminated Mother's and Father's parental rights and designated the caregivers as Star's prospective adoptive parents.

Mother timely appealed.

## DISCUSSION

A. *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception Did Not Apply*

1. *Applicable law and standard of review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225; accord, *In re Celine*

---

[9] In assessing the beneficial parental relationship exception, the juvenile court found Star had been "with the same family for nearly three years, the majority of her life." Star's attorney later corrected the court, clarifying that although Star had been removed from Mother three years earlier, Star had been placed with the current caregivers only since September 2020 (nearly 15 months). The court acknowledged the correction and proceeded to designate the caregivers as prospective adoptive parents.

12

*R.* (2003) 31 Cal.4th 45, 53 ["court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive

13

emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, at p. 633; *In re Katherine J.*, at p. 317.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, at p. 630; accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1225.)

2.      *The juvenile court did not abuse its discretion*

Mother contends the juvenile court erred in terminating her parental rights over Star because the court did not properly follow the analysis of *Caden C., supra*, 11 Cal.5th at page 629 in finding the beneficial parental relationship exception did not apply, and substantial evidence supported application of the exception. Although we agree the court made come findings that were irrelevant or inappropriate under the *Caden C.* analysis, the court considered the proper factors in terminating parental rights.[10]

---

[10]      We reject the Department's contention we should not consider the beneficial parental relationship exception because Mother did not invoke the exception or present evidence in support of her position at the selection and implementation hearing. The juvenile court expressly found Mother was invoking the exception despite her unfamiliarity with the proper terminology, and the court addressed the evidence for the exception "based on the documents that the court has before it and the review of the entire file . . . ."

14

As to the first step of the *Caden C.* analysis, the juvenile court made an equivocal determination, finding "there's been some regular visitation," but the visits were principally virtual, and other maternal family members were not included in the visits. We agree with Mother the evidence demonstrates regular visitation, and the Department does not argue otherwise on appeal. Without exception, the Department reports show Mother consistently visited Star to the full extent authorized by the court's orders, and she often pressed for greater visitation. (*Caden C., supra*, 11 Cal.5th at p. 632; cf. *In re I.R., supra*, 226 Cal.App.4th at p. 212 [visitation not regular where "there were significant lapses" in the mother's visitation]; *In re C.F.* (2011) 193 Cal.App.4th 549, 554 [visitation not regular where "overall [the mother's] visitation was sporadic"].) In addition, whether visits occurred with extended family members is not relevant to whether Mother had regular visitation.

With respect to the second step, the juvenile court found there was not "a significant emotional attachment" between Star and Mother. Mother contends the court erred in basing this conclusion on its improper findings that Mother did not "stand[] in the role of a parent, nor does she play a parental role to Star at this time." Although the Supreme Court in *Caden C.* did not bar juvenile courts from considering a parent's "parental role," a court's proper focus is on whether the child would benefit from continuing the child's relationship with the parent as a result of having a substantial positive emotional attachment to the parent. (*Caden C., supra*, 11 Cal.5th at pp. 632, 636; see *In re D.M.* (2021) 71 Cal.App.5th 261, 270 [juvenile court abused its discretion in "focusing on whether father occupied a 'parental role' in the children's lives, equating that role with attendance at medical

15

appointments, and understanding their medical needs," instead of determining whether there was a substantial, positive emotional attachment]; *In re J.D.* (2021) 70 Cal.App.5th 833, 865 [reversing termination of parental rights because it was unclear "whether the juvenile court's determination that mother did not occupy a 'parental' role encompassed factors that *Caden C.* deems irrelevant"].)

Here, although the juvenile court did not explain what it meant by Mother not occupying a "parental role," the court did not discuss specific improper factors, such as Mother's unresolved case issues, her social media behavior, or her failure to have a role in Star's life other than during visits. Moreover, any error in considering whether Mother occupied a parental role was harmless because Mother failed to establish by a preponderance of the evidence Star had a substantial, positive emotional attachment with her. (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 [harmless error standard applies in dependency cases]; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1128 [same].) Star was only one year old when she was detained from Mother, and Star spent three-quarters of her life outside of Mother's custody. Although interaction between Star and Mother was generally very positive during the first year of Star's placement with Amy, during which Mother was having in-person visits and frequent telephone calls with Star, Star's bond with Mother frayed over time. In March 2020 Mother had a "'melt down'" in front of Star, cursing and damaging furniture, which upset Star and caused Star and Amy to leave the visit through a rear entrance to avoid Mother.

After Star was placed with the caregivers in September 2020, virtual visits were generally uncomfortable, and during one

16

visit Star became sad and withdrawn because Mother did not want to see her toys. And Mother became mad when Star referred to the caregivers as "mom" and "dad." During another visit, Mother called Star a "little brat." Throughout late 2020 and into mid-2021, Star was sometimes distracted and disengaged from Mother during their virtual visits, requiring the caregivers to redirect Star's attention to Mother. Star occasionally shared with Mother what she did during the day or asked Mother to play songs or videos, but the caregivers described other times when Star would not talk to Mother, or if Mother did not allow Star to do what she wanted, Star would not participate in the visit.

It is true the quality of Mother's visits improved with the resumption of in-person visits in late 2021. Star did not act out, she was generally "talkative and engaged" during visits, and at the end of visits Star would help clean up, then hug Mother goodbye. Thus, at the time of the selection and implementation hearing, Star demonstrated some positive connection with Mother. However, nothing in the record shows Star had a "substantial, positive emotional attachment" as a result of which she would benefit from continuing the relationship, for example, Star being sad when the visits ended or expressing any desire to see Mother again. (See *Caden C., supra*, 11 Cal.5th at p. 632 ["courts often consider how children feel about, interact with, look to, or talk about their parents"].)

Even if Star's emotional attachment with Mother was sufficient at the second step, the juvenile court did not abuse its discretion in finding Mother did not meet her burden as to the third step of the *Caden C.* analysis. Mother is correct the juvenile court improperly framed the relevant inquiry, finding it would be detrimental to remove Star from her stable placement

17

with the caregivers, and the benefit of adoption "outweighs the quality and the nature of the relationship between Mother and [Star]." As discussed, as part of the third step, a court should look at the impact of severing the child's relationship with the parent (not the caregivers), then balance that detriment with the benefits of a new adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 634.) Notwithstanding the court's inversion of the standard, however, the court did not abuse its discretion in finding the benefit and security provided by Star's placement with the caregivers as the prospective adoptive parents outweighed any harm that would be caused by the loss of her relationship with Mother. Star lived in foster care since she was a baby. She had been living with her caregivers for nearly 15 months at the time of selection and implementation hearing, during which time Star had begun preschool, was developing language skills, and established new interests and activities. Star was "comfortable and happy," and the caregivers were meeting her needs. Although Star had a positive relationship with Mother, as discussed, she did not have a significant emotional attachment with Mother. On this record, there is no showing of "'exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, at p. 631.)

B.      *The Juvenile Court and the Department Failed To Comply with ICWA and Related California Law*
        1.      *The ICWA inquiry and findings*
        On November 29 and 30, 2018 the social worker asked Mother and Father, respectively, about Star's Indian ancestry,

and both parents denied any known Indian ancestry.[11]  At the December 27, 2018 detention hearing, Mother completed a parental notification of Indian status form (ICWA-020), in which she indicated she had no known Indian ancestry.  Mother also completed a parentage questionnaire identifying Father as Star's father, and Father was also listed on Star's birth certificate.  On a relative information sheet, Mother identified the maternal grandmother and maternal step-grandfather, as well as a maternal aunt.  Although the Department could not locate Father after the initial interview, Mother apparently had information about paternal grandmother because she told the social worker paternal grandmother operated a cannabis dispensary.  The Department did not inquire of any maternal or paternal relatives as to Star's possible Indian ancestry.

At the December 27, 2018 detention hearing, the juvenile court[12] noted Mother indicated on her parental notification form that she had no Indian ancestry, and the court did not "have any reason today to believe that [ICWA] actually applies."  The court also found Father was Star's presumed father.  Maternal grandmother and maternal aunt were present at the hearing, but the court did not inquire of them as to Star's possible Indian ancestry.

At the 12-month status review hearing on October 8, 2020, the juvenile court stated it had previously made ICWA findings

---

[11]   The Department reported Father signed a questionnaire indicating he had no known Indian ancestry, but there is no questionnaire in the record.  Father also told the social worker he "[doesn't] really talk to" his family.

[12]   Juvenile Court Referee Robin R. Kessler.

and the proceeding "was not a case governed" by ICWA. The court did not make findings as to ICWA at any subsequent hearing.

      2.    *ICWA inquiry and notice requirements*

ICWA provides as to dependency proceedings, "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights to . . . an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 5*; In re Antonio R.* (2022) 76 Cal.App.5th 421, 428 (*Antonio R.*); *In re T.G.* (2020) 58 Cal.App.5th 275, 288.) California law also requires notice to the Indian tribe and the parent, legal guardian, or Indian custodian if the court or the Department "knows or has reason to know" the proceeding concerns an Indian child. (§ 224.3, subd. (a); see *Antonio R.*, at p. 429; *In re T.G.*, at p. 288; Cal. Rules of Court, rule 5.481(c)(1) [notice is required "[i]f it is known or there is reason to know an Indian child is involved in a proceeding listed in rule 5.480," which includes dependency cases filed under section 300].) The notice requirement is at the heart of ICWA because it "enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding." (*In re Isaiah W.,* at p. 5; accord, *Antonio R.*, at p. 428; *In re T.G.*, at p. 288; see 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3, subd. (d).)

The juvenile court and the Department "have an affirmative and continuing duty to inquire whether a child for

whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W., supra*, 1 Cal.5th at p. 9; *In re H.V.* (2022) 75 Cal.App.5th 433, 437.) "The duty to inquire begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child. (§ 224.2, subds. (a)-(c))." (*In re T.G., supra*, 58 Cal.App.5th at p. 290; accord, *In re J.C.* (2022) 77 Cal.App.5th 70, 77; *In re H.V., supra*, 75 Cal.App.5th at p. 437.) Section 224.2, subdivision (b), imposes on the Department a duty to inquire whether a child in the Department's temporary custody is an Indian child, which "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."[13] (See Cal. Rules of Court, rule 5.481(a)(1) [the Department "must ask . . . extended family members . . . whether the child is or may be an Indian child"]; *In re D.F.* (2020) 55 Cal.App.5th 558, 566; *In re Y.W.* (2021) 70 Cal.App.5th 542, 551-552.) "The duty to develop information concerning whether a

---

[13] "State law also expressly requires the juvenile court to ask participants who appear before the court about the child's potential Indian status. (§ 224.2, subd. (c).)" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742; accord, *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402.) Similarly, under federal regulations, "[s]tate courts must ask each participant in an . . . involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).)

child is an Indian child rests with the court and the Department, not the parents or members of the parents' families." (*Antonio R., supra*, 76 Cal.App.5th at p. 430; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["The court and the agency must act upon information received from any source, not just the parent [citations], and the parent's failure to object in the juvenile court to deficiencies in the investigation or noticing does not preclude the parent from raising the issue for the first time on appeal . . . ."].)

As we have repeatedly held, "[w]here the Department fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of an adequate inquiry, the error is in most circumstances . . . prejudicial and reversible." (*Antonio R., supra*, 76 Cal.App.5th at p. 435; accord, *In re J.C., supra*, 77 Cal.App.5th at pp. 80-81; see *In re E.V.* (2022) 80 Cal.App.5th 691, 698 ["[W]e reject county counsel's argument Father must show prejudice from the lack of initial inquiry. Father's failure to make affirmative representation about possible Indian heritage does not render the error harmless."]; *In re Y.W., supra*, 70 Cal.App.5th at p. 556 ["A parent . . . does not need to assert he or she has Indian ancestry to show a child protective agency's failure to make an appropriate inquiry under ICWA and related law is prejudicial."]; but see *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578 ["[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the

absence of further inquiry was prejudicial to the juvenile court's ICWA finding."].)

> 3. *The juvenile court failed to ensure the Department satisfied its duty of inquiry*

Mother contends the Department and juvenile court failed to comply with their affirmative and continuing duty to inquire whether Star is an Indian child, and accordingly the court erred when it found ICWA did not apply based solely on the parental notification of Indian status form filed by Mother and Father's statement he had no known Indian ancestry. The Department concedes there is no evidence a social worker ever asked known extended family members whether Star had Indian ancestry and "submits this ICWA-related initial inquiry issue to this Court," observing that in past cases this court has held that failure to fulfill initial inquiry duties "constitutes prejudicial error in most circumstances."

The Department failed to satisfy its initial duty of inquiry under section 224.2, subdivision (b). Notwithstanding Mother's and Father's denial of known Indian ancestry, section 224.2, subdivision (b), obligated the Department to inquire of the extended family members as to Star's possible Indian ancestry. (*Antonio R., supra*, 76 Cal.App.5th at p. 431 ["By requiring the Department to inquire of a child's extended family members as to the child's possible Indian ancestry, the Legislature determined that inquiry of the parents alone is not sufficient."]; *In re Y.W., supra*, 70 Cal.App.5th at p. 556 ["the point of the statutory requirement that the social worker ask all relevant individuals whether a child is or may be an Indian child" is "to obtain information the parent may not have"].) It is undisputed the

Department did not make an inquiry of any extended family members, even though the maternal grandmother and maternal aunt were known to the Department and present at the detention hearing, and Mother appears to have had information concerning paternal grandmother.[14]

The juvenile court also erred in finding ICWA did not apply to the proceeding despite the Department's failure to satisfy its duty of inquiry under section 224.2, subdivision (b). (See *In re J.C., supra*, 77 Cal.App.5th at p. 74 ["the court's finding ICWA did not apply" was not supported by substantial evidence where the court "failed to ensure the Department fulfilled its duty of inquiry under section 224.2, subdivision (b)"]; *Antonio R., supra*, 76 Cal.App.5th at p. 432 [court's finding ICWA did not apply was erroneous where Department failed to inquire of child's extended family members about possible Indian ancestry, and court failed to ensure Department satisfy its duty of initial inquiry].) Although the court instructed the Department "to continue to investigate," the court determined ICWA did not apply based only on the parents' initial statements, and there is no evidence the Department or the court ever revisited the issue.

---

[14] Although the Department filed multiple declarations of due diligence showing it was unable to locate Father, it does not follow that the paternal relatives were not readily available to the Department. The declarations show the Department had Father's full name, date of birth, social security number, associated telephone numbers, and several previous addresses, which may well have included his parents' contact information. On remand, the Department must diligently attempt to identify the paternal grandparents and other paternal relatives.

24

Moreover, the error in failing to inquire of readily ascertainable extended family members is prejudicial. As we explained in *Antonio R., supra*, 76 Cal.App.5th at page 435, "[I]n determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian child. In most circumstances, the information in the possession of extended relatives is likely to be meaningful in determining whether the child is an Indian child—regardless of whether the information ultimately shows the child is or is not an Indian child." Because Star's grandparents and other extended relatives may possess information relevant to her Indian ancestry not known by the parents, the failure of the court and Department to inquire of the family members was prejudicial.

## DISPOSITION

The order terminating Mother's parental rights as to Star is conditionally affirmed. We remand to the juvenile court for the Department and the court to comply with the inquiry and notice provisions of ICWA and related California law, including inquiry of the maternal grandmother, the maternal aunt, the paternal grandmother, and any other reasonably ascertainable extended family members, and to follow up on any information the Department may obtain about Star's possible Indian ancestry. If the court finds Star is an Indian child, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in

25

compliance with ICWA and related California law.  If not, the court's original section 366.26 order will remain in effect.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.