Filed 12/23/22  In re Christopher A. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re CHRISTOPHER A. et al., Persons Coming Under the Juvenile Court Law. | B319994 (Los Angeles County Super. Ct. No. 18CCJP01243) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SELENE M. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Selene M.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Christopher A.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Selene M. (Mother) appeals from the juvenile court's order terminating her parental rights over six-year-old Ivan W. and eight-year-old Christopher A., Jr., under Welfare and Institutions Code section 366.26.[1] Christopher A., Sr. (Father), appeals from the court's order terminating his parental rights over Christopher.[2]

Mother and Father contend the juvenile court abused its discretion in finding the beneficial parental relationship exception to termination of parental rights did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Dependency Petition and Detention*

In February 2018 the Los Angeles County Department of Children and Family Services (the Department) was notified Mother's 15-year-old son R.M. made threats against other high

_____

[1] Further statutory references are to the Welfare and Institutions Code.

[2] Ivan's father is not a party to the appeal.

school students to execute a mass school shooting. Following an investigation of the family's home, the Department filed a dependency petition on behalf of then-three-year-old Christopher, then-22-month-old Ivan (Christopher's half-brother), and their half-siblings R.M. and Selena M.[3] The petition alleged Mother's home was filthy, unsanitary, and hazardous, and Father knew of the condition of Mother's home and failed to protect Christopher.[4] The petition also alleged Mother had mental health issues including posttraumatic stress disorder and major depression, which rendered Mother incapable of providing regular care for the children and placed them at risk of serious physical harm.[5] At the February 27, 2018 detention hearing, the juvenile court detained Ivan from Mother and Christopher from Mother and Father.

On March 15, 2018 the Department filed a first amended petition that also alleged Father had a history of substance abuse and abused alcohol, and he had mental and emotional problems, including posttraumatic stress disorder. The amended petition alleged further Mother and Ivan's father, Ivan W., Sr., had a

---

[3] Mother's appeal concerns only Ivan and Christopher, and Father's appeal concerns only Christopher.

[4] The social worker observed in Mother's home human and animal feces, trash, moldy food, piles of clothes, dirty diapers, broken glass and objects on the floors, and standing water, food, and mold in the kitchen sink.

[5] The petition further alleged Mother emotionally abused R.M. by blaming him for the condition of the home, failed to ensure R.M. received treatment for his mental health condition, and failed to address R.M.'s mass shooting ideation.

history of domestic violence and engaged in violent altercations in Ivan's presence.

B.    *The Jurisdiction and Disposition Hearing*

At the March 23, 2018 combined jurisdiction and disposition hearing, the juvenile court sustained the allegations in the first amended petition concerning Mother's unsanitary home, mental health issues, failure to ensure mental health treatment for R.M., and domestic violence with Ivan W., Sr., and Father's substance abuse and failure to protect Christopher from Mother's unsanitary home.

The court declared the children dependents of the court and removed Christopher and Ivan from Mother's physical custody and Christopher from Father's physical custody. The court granted Mother and Father family reunification services. The court ordered unmonitored visitation for Mother in a neutral setting and unmonitored visits for Father "once and [for] as long as he is testing clean." (Boldface omitted.) The court's order allowed Mother and Father two to three visits per week for two to three hours per visit.

C.    *The Review Period (March 2018 to October 2019)*

In August 2018 the court ordered Father's visits to be monitored after Father missed several scheduled drug tests. As of the September 21, 2018 status report, Christopher and Ivan had been placed together in a foster home and were doing well. Ivan was previously diagnosed with gross developmental delay and was not meeting his developmental milestones. With the help of his caregivers, Ivan had become more verbal and started

4

to walk independently, although he remained developmentally delayed by about a year.

Mother did not visit Christopher or Ivan in June 2018 because she went to visit family in Florida. Mother stated she "'needed a break'" and was "taking care of herself." In January 2019 the social worker reported Mother had one unmonitored visit with Christopher and Ivan in November 2018 and three visits in December. Mother did not visit Christopher or Ivan in January 2019. Mother stated she "'was taking a month off from visiting because she need[ed] a break.'" Mother reported she went to Colorado for a ski trip in January 2019, visited family out of state, and had taken up surfing because she enjoyed having time to care for herself, although she missed the children. Mother visited Christopher and Ivan once in February 2019. At that time, Mother was pregnant with her ninth child.

The social worker reported in August 2019 that Mother had started to visit Christopher and Ivan every Sunday. Mother saw Christopher and Ivan on September 4 after she gave birth to Gabriela S,[6] but Mother stated she could not visit the children again until November because she was unable to drive following her Cesarean section. At an October 7 home visit, the social worker "observed Mother's history of unresolved hoarding continues as the residence appears cluttered."

At the October 31, 2019 18-month review hearing (§ 366.22, subd. (a)), the juvenile court found Mother and Father were not in substantial compliance with their case plans and terminated their reunification services. The court set a selection and

---

[6] The juvenile court detained Gabriela from Mother on October 21, 2019.

5

implementation hearing (§ 366.26),[7] which was later continued to April 12, 2022.

Mother timely appealed from the order terminating her family reunification services as to Ivan, and we affirmed. (*In re Ivan W.* (Dec. 24, 2020, B302034) [nonpub. opn.].)

D.    *The Status Review and Section 366.26 Reports*

In February 2020 the Department reported Mother had been visiting Ivan regularly every Sunday for two hours, but she had been inconsistently visiting Christopher. Father had regular visits with Christopher once each week, during which his contact with Christopher was "appropriate but minimal." The monitor reported Father excused himself for five to 20 minutes at a time, requested visits end early, attempted to discuss the case with the monitor, and made disparaging comments about the social worker.

From March to June 2020 Mother did not visit the children due to unspecified health issues and the COVID-19 pandemic. Mother did not feel comfortable using public transportation to visit for fear of infecting the children. Christopher and Ivan appeared to be closely bonded with their caregivers and with each other.

As of October 2020 Father was having 90-minute visits twice a month with Christopher. The Department reported the visits "go well and without incident." Father generally brought

_____

[7]    The juvenile court set a selection and implementation hearing as to Christopher at the October 31, 2019 18-month review hearing, and as to Ivan on December 19, 2019 after the court terminated Ivan W., Sr.'s, family reunification services.

6

expensive gifts to the visits, and Christopher became upset if Father failed to bring a present. Father also engaged in weekly video chats with Christopher, although Christopher was easily distracted due to his young age. Christopher stated Father told him he would be going home to live with Father, along with Ivan and Gabriella.

In March 2021 the Department reported Christopher was "always excited" to visit with Father. Father provided Christopher with attention and "sweet treats." However, Father did not admonish Christopher after the social worker informed Father that Christopher was becoming more aggressive and had bitten Ivan. Father completed Christopher's homework for him, then told Christopher "begrudgingly that their time together is for fun." Father did not want to punish Christopher for his misbehavior and refusal to complete his homework.

As of August 2021 Father was having three-hour visits with Christopher once per week.[8] Father brought food or snacks to each visit and typically greeted Christopher with a hug. Christopher "usually appear[ed] to be happy" to see Father and was excited to see what Father brought for him. On Christopher's birthday, Father brought him a cake and some money. During visits Father watched Christopher ride his scooter or play on the playground at the park. Father sometimes brought games the two played together. During one visit while Father was helping Christopher with his homework, Father's

---

[8]     Between March and June 2021, Father was visiting Christopher twice a week for three hours each visit. However, Father reduced the visits to once a week starting in June because of the long drive from his home and increase in gas prices.

eyes teared up and his voice cracked as he told Christopher "he wanted him to do well in school and that [Father] did not have a father." Christopher asked Father if he was crying and then gave him a hug. Father continued to have one three-hour visit each week through the end of the year, which went well.

On August 19, 2021 Mother was granted one overnight weekly visit with the children. She had overnight visits with the children from Saturday to Sunday once or twice a month. The children were happy to see her. Mother also had video chats with the children once or twice per week. Mother had only four overnight visits with the children between August 19 and October 9, 2021. On the October 9 visit, Ivan told the caregivers he did not want to visit Mother. From October 25 until the end of November, Mother had only one visit after cancelling due to sickness, needing to study for an exam, or lacking money for gas.

As of December 2021 Mother's visits continued to be sporadic, with Mother visiting the children once or twice per month. The social worker observed safety concerns in Mother's home, including that the living room was filled with cages for Mother's more than 15 guinea pigs, which were breeding in captivity. The Department reported Christopher and Ivan's caregivers were providing a safe and stable home environment with the basic necessities of life. Christopher expressed he would like to live with his siblings either with Mother or with his caregivers. Ivan was unable to make a statement. The children appeared happy with their caregivers.

Starting on January 4, 2022, Mother began having weekly overnight visits. However, the Department discovered during an unannounced visit on January 29 that Mother was not home and had left the children in the apparent care of adult sibling R.M.,

who would not answer the door.  On March 12 Ivan refused to go from the caregivers' car to Mother's car for an overnight visit, stating, "'I don't want to go.'"  Mother told Ivan "she would 'get in trouble with the court'" if Ivan did not go with her, and eventually Ivan agreed to go.  On March 19 Ivan again refused to go for an overnight visit with Mother.  Christopher initially stated he did not want to go to the visit if Ivan would not be there.  Ultimately, Christopher went to the visit with Mother, and Ivan stayed with his caretakers.  When Mother returned with Christopher the next day, Mother kissed Ivan, who responded, "'[N]o, I'm not going'" (apparently thinking Mother was picking him up), and he began to scream.

According to the April 6, 2022 last minute information for the court, during the social worker's unannounced visits to Mother's home, Mother "reports extreme fatigue, feeling overwhelmed by caring for the children for one day, [and] difficulty concentrating, is slow to respond to the children's requests for food, and directs [R.M.] to assist with caretaking."  Further, Mother told the social worker "the court is 'making her do visits.'"

The report also stated that Father had consistent three-hour visits with Christopher once per week, during which Father "generally walk[ed] around the playground with [Christopher] and provide[d] snacks."  Father continued to discuss the case with Christopher and cried when telling Christopher he was "'sad [Christopher's] not home.'"  On one occasion, the social worker overheard Christopher tell Father, "'when you cry I sometimes get embarrassed.  I don't know why but I get embarrassed.'"  When the Department cancelled visits, Father briefly spoke to Christopher by telephone or video chat, during which

9

"Christopher consistently [was] focused on asking [Father] what [he was] bringing to the next visit for him." The Department reported Father "has never engaged [Christopher] in any meaningful conversation about his well-being, interpersonal relationships, school progress or acting out behaviors in the home." Christopher had begun misbehaving with his caregivers. When asked to do his homework, Christopher refused and made aggressive statements to his caregivers, such as "'Fuck you Bitch.'" Christopher also randomly made statements such as "'the house is on fire.'" The social worker stated Father "has never engaged the resource parents in any effort to cooperatively parent the child and resolve his behaviors of concern."

E.    *The Selection and Implementation Hearing*

On April 12, 2022 the juvenile court held the selection and implementation hearing.[9] The court heard testimony from Father and admitted into evidence the Department's reports since October 2021 and two bonding studies: one conducted by Dr. Chuck Leeb regarding the children's attachment to Mother,[10] and another conducted by Dr. Nancy Kaser-Boyd regarding Christopher's attachment to Father.

---

[9]    The juvenile court also heard and denied Mother's and Father's section 388 petitions. The section 388 petitions are not at issue in this appeal.

[10]    The juvenile court granted Father's motion in limine to exclude Dr. Leeb's opinions as to the bond between Father and Christopher.

### 1. *Dr. Leeb's report*

Dr. Leeb, a clinical and forensic psychologist, observed visits between Mother and the children on June 14 and July 27, 2021. Christopher hugged Mother, sought out Mother's attention and company, chose to stand or sit next to Mother, and was tearful when Mother left. Ivan sought out Mother's attention and chose to stand or sit next to Mother. In an August 9, 2021 report, Dr. Leeb concluded Mother had a "good" bond with both children, but placement of the children with Mother would not be in their best interest because of Mother's mental health issues and poor insight. Dr. Leeb opined further the bond between Christopher and Ivan was "very strong" and recommended "in the strongest terms that these children be kept together" because "there is a very high probability of severe emotional repercussion for both children" if Christopher and Ivan are separated.

### 2. *Dr. Kaser-Boyd's report*

Dr. Kaser-Boyd, a clinical and forensic psychologist, conducted a study of the bond between Father and Christopher. Dr. Kaser-Boyd reviewed the Department's January 12, 2021 and January 4, 2022 reports, conducted a forensic psychological interview of Father, and observed visits between Father and Christopher on three occasions. During the first visit on December 22, 2021, which took place in Dr. Kaser-Boyd's office, Father brought presents and games for Christopher. Dr. Kaser-Boyd observed, "Christopher is very comfortable with his father. There wasn't overt affection, but there was a lot of interaction." During a January 5, 2022 visit at the park, Christopher seemed happy. Father brought toys, games, and food for Christopher. Father and Christopher played together, and Father gave

11

Christopher "rule-based" instruction on the game and directed Christopher about cleaning up. During the third visit on January 12, 2022, again at Dr. Kaser-Boyd's office, Father brought toys, games, and snack food. Dr. Kaser-Boyd interviewed Christopher, who stated he would like overnight visits with Father but not if it meant not having overnight visits with Mother and his siblings. When asked by Dr. Kaser-Boyd whether he wanted to live with Father, Christopher responded he wanted "'a couple of overnights [with Father] before that.'" Christopher stated as to whether he liked living with his caregivers, "'It's OK.'"

Dr. Kaser-Boyd concluded Father "showed good energy to connect to Christopher" and "Christopher appeared to be happy to see his father and happy throughout the visits." Dr. Kaser-Boyd did not "observe much physical affection" between Father and Christopher, but "they were clearly engaged with each[ ] other." Christopher referred to Father as "'Dad'" and approached Father "when he had questions or when he was hungry." Dr. Kaser-Boyd opined Christopher "clearly exhibited a connection" to Father and "it would be a loss to Christopher, Jr., to be removed from a legal relationship with his father, i.e., a clear detriment even though the Department is not convinced that he is consistently sober."

### 3. *Father's testimony*

Father testified he had made over 200 visits with Christopher during the dependency case. Father had not missed any visits, other than due to the COVID-19 pandemic. Father usually had a video chat with Christopher on the Monday before the week's visit for Christopher to say what kind of snacks to bring to the visit. Father also brought games, toys, and books to

12

the visits. If Christopher brought homework to the visit, Father did the homework for him. The caregiver or social worker would inform Father about Christopher's medical needs. Father encouraged Christopher to do well in school and behave and follow the rules of the caregivers. Father tried to teach Christopher how to fish, to ride a skateboard, and "to be a good person and not to fight against bullies."

Christopher hugged and kissed Father at the start and end of each visit. Father observed Christopher's hobbies were building Lego sets and playing video games. Asked what he had learned about Christopher during his visits, Father replied, "Well, that he is a good kid. I mean . . . I have missed four years of milestones with the child. I mean, there is a distance . . . [of] approximately 200 miles. Basically, you know, he is a good kid and he has always been good with me and that is about it."

4. *Closing arguments and the juvenile court's ruling*

The Department recommended termination of Mother's parental rights as to Ivan and Christopher and Father's parental rights as to Christopher. The Department's attorney argued Mother failed to visit the children consistently, noting that between August 21, 2021 and March 26, 2022 Mother had missed 14 out of 31 visits. Further, the children did not have a substantial, positive emotional bond with Mother, noting that "Ivan [was] crying, saying he does not want to go back to the Mother."

Christopher's and Ivan's attorneys supported the Department's recommendation to terminate parental rights. Christopher's attorney argued as to Father that he had not shown more than "distance parenting," Christopher remained

13

"apprehensive" about overnight visits with Father, and Christopher's bond with Father was not "significant enough" to warrant an exception to adoption.

Mother's attorney argued the beneficial parental relationship exception applied and Christopher and Ivan would benefit from continuing their relationship with Mother. Further, Dr. Leeb's report showed the bond between the children and Mother was good and termination of Mother's parental rights would be detrimental to the children.

Father's attorney argued the beneficial parental relationship exception applied and Christopher would benefit from continuing his relationship with Father, relying on Dr. Kaser-Boyd's report and Father's consistent visitation.

The juvenile court found by clear and convincing evidence Christopher and Ivan were adoptable and no exception to termination of parental rights applied. The court found Mother had not consistently visited with the children, noting "long" and "significant" periods during which Mother's visitation was not consistent. The court concluded, "There is some attachment here between Christopher and Ivan and the Mother, but it is not of the nature and quality that overrides the benefits of adoption." The court found Mother had not "served in a parental role" and failed to be involved in the children's medical and educational needs. The court added, "Yes, the kids seem interested in seeing her, but their bond with the siblings is much tighter. And every child has some bond with a parent that shows up at visits. And that is what we have here. But we don't really have much more." Further, Ivan did not want to go on overnight visits with Mother. Christopher was willing to "go along with the visits," but he had not developed a deep attachment to Mother through the visits.

14

The court noted that Dr. Leeb found the bond between Mother and the children was "good," but the court did not find Dr. Leeb's opinions persuasive "in that they are conclusory about the nature of the bond." The court reasoned as to the effect of terminating parental rights, "[t]here is always some detriment. So more than some detriment is needed." The court concluded that in light of the lack of a substantial, positive emotional attachment between Mother and the children, Mother had not shown terminating her parental rights would be detrimental to the children when weighed against the benefits of adoption.

As to Father, the court found his visitation was regular but Christopher lacked a substantial, positive emotional attachment to Father. The court reasoned, "Christopher enjoys his time with his Father and is happy to see him but he doesn't think he wants overnights. If he had a strong attachment, that answer would be . . . different. [Christopher] is clearly more focused on his relationship with his siblings and his caregiver." The court described Father's relationship with Christopher as "static" in that Father continued to visit but had not become more involved with Christopher's schooling or behavioral issues. Further, Christopher "did not seem to want to have . . . a deeper relationship" with Father.

With respect to detriment, the court stated it was "not particularly persuaded by Dr. Kaser-Boyd's analysis," noting the lack of "detail or analysis" to support her finding termination of Father's parental rights would be detrimental to Christopher. The court reasoned, "Father sees his role as a friendly visitor who brings gifts, talks to [Christopher] about a few things, and that is really it." As such, Christopher "would not have a significant

15

benefit from the ongoing relationship with Father" and would not experience significant detriment if the relationship terminated.

The court found the beneficial parental relationship exception did not apply and terminated the parental rights of Mother, Father, and Ivan W., Sr. The court designated caregiver Edmee P. as the children's prospective adoptive parent.

On April 14, 2022 the juvenile court placed the matter back on calendar to "clarify its ruling under . . . *Caden C.*" The court found Mother's visits with Christopher and Ivan conferred only an incidental benefit on the children and the children's bond with Mother was not significant. The court noted Mother "appeared overwhelmed, fatigued, and was slow to respond to the children's needs" during the social worker's recent unannounced visits, which the court reasoned "indicates not a very high quality of visits." The court found further, "[I]t appears that Mother . . . was doing the visits because she thought this was just what the court wanted. I find that over the years I have had this case I don't get a very strong sense of Mother's desire to see her kids as much as possible, which indicates a weak bond. There have been times where she would not visit for a whole month."

As to Father, the court found "the quality of his interaction with [Christopher] was not substantial or particularly positive." Father "would sometimes cry during his visits," and Christopher "told Father not to do that" and "it embarrassed him." Further, Christopher "seemed more focused on what Father would bring him as a gift than actually enjoying [Father's] company." Moreover, "Father doesn't discuss personal issues with the child such as school, homework, his behavioral issues at home or other significant emotional issues." Father kept Christopher occupied during visits, but "there wasn't much affection." The court again

16

noted that "Christopher, when asked, didn't show much interest in having overnights with Father," and added, "[T]here is no indication that [Christopher] is affected by the absence of [Father]." The court concluded Christopher and Father "had only a surface relationship of playing in [the] park."

Mother and Father timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2020) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The

17

language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child."  (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'"  (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'"  (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317 (*Katherine J.*).)  "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights."  (*Caden C.*, at p. 633; accord, *Katherine J.*, at p. 317.)  "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion."  (*Caden C.*, at p. 630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

18

B.      *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception Did Not Apply to Mother's Relationship with Christopher and Ivan*

Mother contends the juvenile court abused its discretion in terminating her parental rights over Christopher and Ivan because substantial evidence did not support the court's determinations that Mother failed to maintain regular visitation and that there was no substantial, positive emotional attachment between Mother and the children such that children would benefit from continuing the relationship. The court did not abuse its discretion.

Substantial evidence supports the juvenile court's finding that Mother failed to show regular visitation to the extent permitted by court orders. As the juvenile court observed, Mother's visitation was inconsistent for long periods throughout the dependency proceeding. Mother did not visit Christopher or Ivan in June 2018 because she went to visit family in Florida, explaining she "'needed a break'" and was "'taking care of herself.'" In 2019 Mother did not visit Christopher or Ivan in January and visited just once in February, explaining she "'was taking a month off from visiting because she need[ed] a break.'" Instead, Mother went to Colorado for a ski trip, visited family out of state, and went surfing. And Mother refused to visit the children from March to June 2020 due to her "health issues" and concerns about the COVID-19 pandemic. Although the COVID-19 pandemic may have limited in-person visits, there is no evidence Mother had even virtual visits with the children during this extended period.

Mother likewise did not take full advantage of her visitation in 2021 and early 2022. Although Mother was afforded

19

two to three unmonitored in-person visits each week, during most of 2021 she visited with the children once every other week, with one or two video chats during the week. In August 2021 the court ordered one overnight visit per week, but Mother had only four visits in the following two-month period. Between October 25 and November 29, Mother had only one overnight visit with the children, saying the children could not visit because she was studying, sick, or lacked gas money. As of December 2021, Mother's visits remained "sporadic," with one or two visits per month. Mother notes she consistently had overnight visits with the children once a week from December 24, 2021 through February 26, 2022. But during an overnight visit in January 2022, Mother left the children in the care of adult sibling R.M. Then in March 2022 (just one month before the selection and implementation hearing), Mother had only two out of four overnight visits with Christopher and only one with Ivan.

Mother therefore failed to show she maintained regular visitation and contact with the children taking into account the visitation she was allowed under the court's orders. (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1070 [substantial evidence supported juvenile court's determination the father's visits with the child were not consistent where visitation "throughout the years-long dependency proceeding was sporadic and also entailed significant gaps, and . . . even when he did visit his children he was frequently late"]; *In re I.R., supra*, 226 Cal.App.4th at p. 212 [juvenile court did not abuse its discretion in finding beneficial parental relationship exception did not apply where it was undisputed "there were significant lapses" in mother's visitation]; *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [visitation not regular where the mother missed five visits in the six weeks preceding

20

the selection and implementation hearing and there was a "troubling manner of [m]other's cancellations and pattern of changing her plans last minute"].)

Substantial evidence also supports the juvenile court's determination Mother failed to show the children had a substantial, positive emotional attachment to Mother. Christopher and Ivan both spent the majority of their lives with their caregivers, with whom they had been placed since Ivan was two years old and Christopher was three. Although Christopher and Ivan enjoyed their visits with Mother, Ivan grew more distant from Mother over time, eventually refusing to go on overnight visits and screaming when Mother kissed him in March 2022 because he did not want to go with her to her home. Christopher continued to have overnight visits with Mother, but the record does not contain any evidence that after September 2018 he wanted more visits or was sad when the visits ended.

Mother highlights that Dr. Leeb opined Mother's bond with both children was "good." But as the juvenile court found, Dr. Leeb did not provide any details about the nature of the bond, only providing a conclusory opinion. Further, the record supports the juvenile court's finding that Mother's bond was simply the type of bond children have "with a parent that shows up at visits." However, "the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent." (*Katherine J., supra*, 75 Cal.App.5th at p. 318; accord, *B.D., supra*, 66 Cal.App.5th at p. 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent"].)

Mother contends the juvenile court improperly focused on whether Mother occupied a parental role in the children's life. However, the Supreme Court in *Caden C.* did not bar juvenile courts from considering a parent's "parental role," but rather, "prohibits juvenile courts from finding against a beneficial relationship *solely because* a parent has failed to surmount the issues that initially brought the child into dependency care—a standard that few parents facing termination of parental rights could hope to meet." (*Katherine J., supra*, 75 Cal.App.5th at p. 309; accord, *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211-212 [reversing order terminating parental rights and remanding for new section 366.26 hearing because "trial court's terse ruling" that "the parents 'ha[d] not acted in a parental role in a long time'" could erroneously mean the parents "were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care"].) A finding the parent does not serve in a "'parental role'" in the child's life does not necessarily mean the juvenile court failed to consider the child's substantial, positive emotional attachment to the parent as required by *Caden C., supra*, 11 Cal.5th at page 636. (*Katherine J.*, at pp. 309, 321-322 [affirming order terminating parental rights where father had not served in parental role in child's life and father's unresolved issues prevented him from maintaining strong, positive attachment with child, thereby diminishing benefits to child from relationship].)

Here, in considering the parental beneficial relationship exception, the juvenile court found Mother had not "served in a parental role" and failed to be involved in the children's medical and educational needs. However, the court added that Mother's inability to meet the children's needs "go[es] to the quality of the

22

relationship." And the court expressly focused on "the quality and depth of the relationship" between Mother and the children, as required by *Caden C.* The court's finding that "[t]here is some attachment here between Christopher and Ivan and the Mother, but it is not of the nature and quality that overrides the benefits of adoption" shows the court appropriately considered whether the children had a substantial, positive emotional attachment to Mother, not just whether Mother was acting in a parental role.

C.      *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception Did Not Apply to Father's Relationship with Christopher*

At the first step of the *Caden C.* analysis, the juvenile court found Father had regular visitation with Christopher. We agree with Father the evidence demonstrates regular visitation, and the Department does not contend otherwise on appeal. The record reflects that Father made great efforts to regularly visit Christopher, traveling approximately 200 miles weekly to see him and visiting Christopher over 200 times during the case.

With respect to the second step, Father contends substantial evidence does not support the juvenile court's finding there was not a substantial, positive emotional attachment between Christopher and Father, relying on Dr. Kaser-Boyd's bonding study and evidence that Christopher looked forward to visits with Father and was comfortable in his presence. Father argues further the court's finding Christopher did not want overnight visits with Father is not supported by the evidence, and the court inappropriately focused on the fact that Father cried during visits with Christopher. Substantial evidence supports the juvenile court's findings.

The record shows Christopher enjoyed his visits with Father in the park, referred to Father as "'Dad'" during visits, and felt comfortable asking him questions and asking for food when he was hungry. Christopher listened to Father and followed Father's instructions about cleaning up. Father brought snacks, games, and toys to engage with Christopher during visits. Father testified Christopher hugged and kissed him at the beginning and end of visits. However, Dr. Kaser-Boyd noted "[t]here wasn't overt affection" between Christopher and Father during the visits she observed.

Although the weekly visits were very positive, there is no evidence Christopher viewed Father as "more than a mere friend or playmate." (*B.D., supra*, 66 Cal.App.5th at p. 1230.) As the social worker reported in the Department's April 6, 2022 last minute information for the court, "the quality of the visits [is] limited," and Father "has never engaged [Christopher] in any meaningful conversation about his well-being, interpersonal relationships, school progress or acting out behaviors in the home." The social worker's observation finds support elsewhere in the record. When Christopher asked Father to help him with his homework, Father completed the homework but "responded begrudgingly that their time together is for fun." And Father refrained from admonishing Christopher when Father learned Christopher bit Ivan. At the time of the selection and implementation hearing, Christopher was acting out against his caregivers and slipping away to a neighbor's house to avoid doing his homework. Yet there is no evidence Father engaged with Christopher about his conduct and the reasons for his disobedience other than telling Christopher to live by the

24

caregivers' rules and that Christopher would face consequences for bad behavior.

Father contends the court's focus on his failure to address Christopher's academic problems and misbehavior constituted improper consideration of Father's lack of a parental role. As *Caden C.* instructs, the proper inquiry at the selection and implementation hearing is not whether the parent "would be the better custodial caregiver." (*In re Caden C., supra*, 11 Cal.5th at p. 634; see *In re L.A.-O., supra*, 73 Cal.App.5th at p. 210.) However, the court here appropriately examined the level of Father's involvement in Christopher's life to gauge the depth and quality of Christopher's relationship with Father, finding "Father sees his role as a friendly visitor who brings gifts, talks to [Christopher] about a few things, and that is really it." There is some merit to Father's assertion the juvenile court misunderstood the record in finding Christopher did not want overnight visits with Father. As discussed, Christopher told Dr. Kaser-Boyd he would like overnight visits with Father, but only if it would not cause him to miss his overnight visits with Mother or his siblings. Although the court mischaracterized Christopher's position as "he doesn't think he wants overnights," reasoning he would feel differently if he had a strong attachment to Father, the court's ultimate conclusion that Christopher was more focused on his relationship with his siblings than with Father is supported by Christopher's statements to Dr. Kaser-Boyd. Moreover, Father has not shown prejudice in light of the

lack of evidence in the record of a substantial emotional attachment between Christopher and Father.[11]

Further, the juvenile court did not abuse its discretion in finding the benefit and security provided by Christopher's placement with the caregivers as the prospective adoptive parents outweighed any harm that would be caused by the loss of his relationship with Father. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1158-1159 [affirming finding beneficial parental relationship exception did not apply where father regularly visited child and developed beneficial bond with her, but child viewed father as "'a fun, friendly person' to have visits with" and was not affected by missed visits, and father had not been involved in child's medical issues or educational decisions and was not a parent figure in her life].)

At the time of the selection and implementation hearing, Christopher had been living with his caregivers for four out of his seven years. As Father testified, he had "missed four years of milestones with the child." Further, Christopher had never lived with Father, only seeing him on weekends prior to the filing of the dependency case. Although Christopher had a positive

---

[11] Contrary to Father's argument, the juvenile court did not err in considering that Father's crying during visits made Christopher feel "'embarrassed'" and uncomfortable. The assessment of the parent-child bond necessarily includes consideration of "'the "positive" or "negative" effect of interaction between parent and child.'" (*B.D., supra*, 66 Cal.App.5th at p. 1225.) Although it is unclear why Christopher was embarrassed when Father cried out of sadness that Christopher could not live with him, Christopher's response generally suggests he did not share Father's sadness.

relationship with Father, as discussed, Father did not show Christopher had a substantial emotional attachment with him. Moreover, the juvenile court was "not particularly persuaded" by Dr. Kaser-Boyd's findings given the lack of detail or analysis to support her conclusion Christopher's loss of his relationship with Father would be a "clear detriment" to Christopher. And Dr. Kaser-Boyd did not evaluate whether the loss of the relationship would be harmful to Christopher "even when balanced against the benefits of a new adoptive home." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.) Nor did Dr. Kaser-Boyd consider what benefit Christopher would receive from adoption in the same home as his half-sibling Ivan, which relationship Christopher unambiguously prioritized. On this record, the juvenile court did not abuse its discretion in finding Father had not shown his relationship with Christopher was "so important to the child that the security and stability of a new home wouldn't outweigh its loss." (*Caden C., supra*, 11 Cal.5th at pp. 633-634; accord, *In re A.L., supra*, 73 Cal.App.5th at p. 1161.)

## DISPOSITION

The order terminating Mother's and Fathers' parental rights is affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.